**QUECHAN INDIAN TRIBE, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. CIV 02CV1096 JAH AJB.**

United States District Court, S.D. California.

Jan. 10, 2008.

Bryan R Snyder, Law Office of Bryan R. Snyder APC, San Diego, CA, Frank R. Jozwiak, Sharon I. Haensly, Thane D. Somerville, Morisset Schlosser Jozwiak and McGaw, Seattle, WA, for Quechan Indian Tribe.

U.S. Attorney CV, U.S. Attorneys Office Southern District of California, Civil Division, San Diego, CA, Claire E. Douthit, Western Area Power Admin., U.S. Dept. of Energy, Lakewood, CO, Vince L. Farhat, Office of U.S. Attorney, Cent. Dist. of Cal., Los Angeles, CA, for United States.

**ORDER RE: MOTIONS FOR SUMMARY JUDGMENT AND MOTIONS TO DISMISS [Doc. Nos. 103, 105, 109, 114, 124, 126, 134, 165]**

JOHN A. HOUSTON, District Judge.

### *FACTUAL BACKGROUND*

**I. Reservation**

The Fort Yuma Reservation was established by Executive Order in 1884. *See*

President Chester A. Arthur, Executive Order, Tribe's Exh. 3; Govt's Exh. 8 (Douthit Decl.). The reservation includes 45,000 acres along the Colorado River. *See id.* In 1893, The Tribe and the United States entered into an agreement whereby the Tribe relinquished its interest in certain non-irrigable land within the reservation. *See* Tribe's Exh. 4; Govt's Exh. 9 (Douthit Decl.).

A dispute arose over the status of the land at issue in the 1893 agreement. *See* Solicitor Opinion, January 8, 1936, Govt's Exh. 10 at 106 (Douthit Decl.). In 1936, the Solicitor of the Department of the Interior opined Indian title to the non-irrigable lands was extinguished. *Id.* at 113.

In 1951, Quechan filed an action before the Indian Claims Commission challenging the 1893 agreement, which the parties refer to as Docket No. 320. *See Arizona v. California,* 530 U.S. 392, 403, 120 S.Ct. 2304, 147 L.Ed.2d 374 (2000), Govt's Exh. 11 at 116 (Douthit Decl.). The matter was transferred to the Court of Claims in 1976. *Id.*

In 1977, the Solicitor issued another opinion on the title to lands within the Quechan Reservation. *See* 1978 Solicitor's Opinion, Tribe's Exh. 11 at 48; Govt's Exh. 7 at 69 (Douthit Decl.). The Solicitor again opined title to the land "was unconditionally ceded to the United States by virtue of a negotiated 1893 cession agreement and the 1894 statute, ratifying such agreement." *Id.* Upon finding "sharp and continuing divergences in legal views" on who owns title to the lands, the Solicitor issued another opinion on December 20, 1978. The Solicitor opined "the conditional cession in 1893 was never effected and the title to the non-irrigable acreage, therefore, [remained] with the Tribe." *Id.*

at 49; Govt's Exh. 7 at 70. Based upon this decision, the parties entered into a settlement of the Docket No. 320 matter in 1978. *Id.*

The Secretary of the Interior issued an order approving the opinion on December 20, 1978. *See* Govt's Exh. 14 (Douthit Decl.). The Secretary noted the Tribe's title was subject to exceptions and conditions, namely third party rights. *Id.* at 135. On February 6, 1981, the Secretary issued a Secretarial Determination and Directives on the Quechan Reservation boundaries recognizing the 1884 boundaries of the reservation as modified by the Executive Order of December 19, 1900, and recognizing third party interests. *See* Tribe's Exh. 14; Govt's Exh. 16 (Douthit Decl.).

## II. Transmission Line

The Congressional Act of 1924 authorized the Secretary of the Interior ("Secretary") to acquire a right of way or easement reserved to the United States for irrigation purposes. *See* Tribe's Exh. 9. On April 21, 1942, the Bureau of Reclamation ("BOR") applied for a right-of-way permit for a "transmission line in connection with [the] Parker Dam Power Project." Department of Interior Application, Tribe's Exh. 8; Govt's Exh. 8 (Douthit Decl.). The application was apparently approved on July 23, 1942. *See* Letter from Acting Commissioner to Secretary of the Interior, Govt's Exh. 5 (Douthit Decl.).[1] Congress enacted *An Act for the Acquisition of Indian Lands for Parker Dam Power Project* on October 28, 1942, concerning the acquisition of "lands required in connection with the construction, operation, and maintenance of electric transmission lines and other works..." Govt's Exh. 31 (Douthit Decl.).

---

1. The letter includes language that "enclosures" were approved. The Government states the application was approved. The Tribe maintains, for purposes of the motion they assume the BOR received the permit for the right-of-way.

On May 17, 1971, the BOR submitted an amended application for a 100–foot right-of-way for a 161–kv transmission line and a 50–foot access road under Section 4, Subsection P of the Act of December 5, 1924. Govt's Exh. 32 (Douthit Decl.). The Bureau of Land Management ("BLM") approved the request for the amended right-of-way on October 30, 1971.[2] The BOR later transferred the right-of-way to Western Area Power Administration ("Western").

In July 1994, in anticipation of pole replacement and transmission line maintenance, Western retained Western Cultural Resource Management ("WCRM") to conduct an inventory of cultural resources of the Gila–Knob 161–kv transmission line and access roads. *See* Tribe's Exh. 25 at 138, 153. WCRM surveyors located 26 archeological sites and 7 isolates which included lithic scatters, temporary camps, ceremonial areas and geoglyphs. *Id.* at 153. Work began on the pole replacement project in October 1998. *See* Wood Pole Rehabilitation Program Weekly Log, Tribe's Exhs. 38, Western's Environmental Lessons Learned Investigation Damage to Archeological Resources During the Gila–Know Pole Replacement Project ("Lessons Learned Report"), Tribe's Exh. 46, URS Corporation, Documentation of Activities Along the Gila Know 161–kv Transmission Line Rehabilitation Project ("URS Report"), Tribe's Exh. 52. Certain cultural sites were damaged during the pole replacement project. *Id.* The Tribe was notified of the damage on March 2, 1999. *See* Lessons Learned Report, Tribe's Exh. 46 at 560.

### PROCEDURAL BACKGROUND

Plaintiff, Quechan Indian Tribe (referred herein as "the Tribe," "Plaintiff," and "Quechan"), originally filed a complaint on June 7, 2002. The action was stayed pursuant to stipulation pending the outcome of land ownership issues in *Arizona v. California,* 530 U.S. 392, 120 S.Ct. 2304, 147 L.Ed.2d 374 (2000), on July 18, 2003. On March 23, 2004, Plaintiff filed a First Amended Complaint under seal. Thereafter, the case was transferred to this Court. On June 14, 2004, Plaintiff filed a motion to lift the stay and for a bifurcated schedule. Following settlement of *Arizona v. California,* and Defendant's (referred herein as "the government," "the United States," and "Defendant") notification that it no longer opposed lifting the stay, the Court granted the motion and denied the motion for bifurcated schedule as moot.[3]

Plaintiff filed a Second Amended Complaint ("SAC") under seal on March 16, 2005, suing in its own capacity and as *parens patriae* on behalf of its members. Plaintiff seeks damages, and injunctive and declaratory relief for negligence, negligence *per se,* gross negligence, trespass and public and private nuisance pursuant to 28 U.S.C. § 2674.[4] Specifically, Plaintiff alleges Western employees knowingly drove vehicles over and permanently scarred numerous cultural sites on the Fort Yuma Reservation during power pole replacement along the Gila–Knob power-line ("Project").

### I. Motions for Summary Judgment

On September 2, 2005, Plaintiff filed two motions for partial summary judgment: (1) for partial summary judgment as to

---

**2.** The date is illegible on the letter. However, Defendant maintains, without objection, the correct date is October 30, 1971.

**3.** The parties stipulated to a case management order that resolved the issue of bifurcation.

**4.** Pursuant to the parties' stipulation, the Tribe's claims for conversion, tortious interference with property, and invasion of privacy were dismissed with prejudice. *See* Doc. No. 88.

liability for negligence, gross negligence, negligence *per se,* trespass, and private and public nuisance (Doc. No. 103); and (2) on the issue of Tribe's beneficial title to and non-property interests in the right-of-way lands (Doc. No. 105).

Defendant's two motions for summary judgment: (1) for summary judgment or in the alternative partial summary judgment(Doc. No. 114); and (2) on the issue of land ownership (Doc. No. 109) were filed *nunc pro tunc* to September 2, 2005.

On November 4, 2005, Defendant filed a memoranda in opposition to Quechan's motions (Doc. Nos. 131, 132), and Plaintiff filed an opposition to Defendant's motion for partial summary judgment regarding land ownership and motion for summary judgment or in the alternative partial summary judgment (Doc. Nos. 122, 123). On December 9, 2005, the parties filed replies (Doc. Nos. 138, 144, 152, 153). Plaintiff filed a surreply (Doc. No. 173) to Defendant's motion regarding land ownership, upon leave of Court, on December 30, 2005.

## II. Other Motions

On November 4, 2005, Plaintiffs filed two motions to strike: (1) to strike portions of Defendant's motions for summary judgment (Doc. No. 124) and (2) to strike deposition transcript of Dr. Jamie Cleland and references to the transcript in summary judgment motions (Doc. No. 126). Defendant filed oppositions to the motion to strike the Cleland deposition (Doc. No. 142) and motion to strike portions of the motions for summary judgment (Doc. No. 143) on December 9, 2005. Plaintiff filed replies (Doc. Nos. 170, 171) on December 30, 2005.

On November 4, 2005, Defendant filed a motion to strike (Doc. No. 134) the following documents and issues: (1) Cachora letter and references to it in Plaintiff's memoranda and statement of undisputed facts, WCRM Report page 177a, (2) por-

tions of deposition transcripts not cited in the record, Kaye F. Nealy Declaration and (3) all references to it in the motions. Plaintiff filed an opposition (Doc. No. 148) to Defendant's motion to strike on December 9, 2005. On December 23, 2005, Defendant filed a reply (Doc. No. 164).

Defendant also filed objections to declarations of Robert Bee and Clyde M. Woods (Doc. No. 141) and a reply (Doc. No. 139) to Plaintiff's opposition to Defendant's statement of material facts in support of motion for summary judgment. Plaintiff filed a response (Doc. No. 172) on December 30, 2005.

Plaintiff filed a motion to strike the declaration of Mary Barger (Doc. No. 165) on December 23, 2005. Defendant filed an opposition (Doc. No. 177) to the motion on January 6, 2006. On January 31, 2006, Plaintiffs filed a reply (Doc. No. 188).

## *PRELIMINARY ISSUES*

### I. Motions to Strike and Objections

 The motions to strike and objections filed by the parties are denied as moot, because the Court finds the information objected to was either irrelevant or unnecessary to the Court's determination of the motions.

### II. Statute of Limitations

Defendant argues the Court should dismiss the action as barred by the statute of limitations. The government maintains the Tribe alleges the damage to the cultural sites occurred from November 2, 1998 to January 31, 1999 and the Federal Tort Claims Act ("FTCA") administrative claim was filed on February 14, 2001. Defendant contends the claim accrues at the time of the plaintiff's injury. Therefore, Defendant argues, the Tribe's administrative tort claim to Western was beyond the two year limitations period. The govern-

ment further contends the damage to the sites were not hidden from the Tribe, so the lenient standard, accrual when the Tribe knew or should have known, does not apply to this action. Even if the lenient standard applied, the government argues, the action is still barred, because Plaintiffs should have known about the damage when it occurred.

The Tribe argues that under the discovery rule, the claim accrues when the plaintiff discovers, or in the exercise of reasonable diligence, should have discovered the injury and its cause, applies to this case. Quechan maintains it was notified of the damage on March 2, 1999. As such, Plaintiff argues, the administrative claim of February 13, 2001, was within the two year limitations period.

■ The FTCA contains a two year period of limitations. See 28 U.S.C. § 2401(b). "An FTCA claim 'accrues when the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, the injury and its cause.'" Bartleson v. United States, 96 F.3d 1270, 1277 (9th Cir.1996)(citing Landreth v. United States, 850 F.2d 532, 533 (9th Cir. 1988)).[5]

According to the allegations, the cultural resource sites were damaged from November 2, 1998 to January 31, 1999. The Tribe was notified of the damage to site 7140 on March 2, 1999. See Lessons Learned Report, Tribe's Exh. 46 at 560.

The government argues the Tribe, in the exercise of reasonable diligence, should have known of the injury and its cause when the damage occurred, because the Tribe alleges it places significant value on the cultural sites, but ignored Western's repeated efforts to consult during the pole-replacement project. In support, Defendant submits correspondence between Western, Bureau of Land Management ("BLM"), Quechan and the Office of Historic Preservation regarding the pole-replacement project and the determination that the project will not effect eligible [6] sites dated May 31, 1995, June 26, 1995, June 19, 1997, August 3, 1998 and September 3, 1998. Farhat Decl., Exhs. 13, 16, 19, 20, 21. Defendant also relies on Plaintiff's conditioned admissions that they received and did not respond to the letters from Western, the deposition testimony of Mike Jackson, Tribal President in which he recalls seeing the letters when he came into office and does not know if anyone responded to the letters, and the deposition testimony of Lorey Cachora stating no knowledge as to whether anyone responded to the May 31, 1995 letter. Id., Exhs. 17, 18, 14. The government also relies on the fact the Tribe did not object or comment on the finding that only ten of the resource sites were eligible for listing on the National Register. Id., Exh. 17.

Quechan argues Western inflicted damage on five other sites that are the subject of the Tribe's motion for summary judgment and four sites not subject to the motion during the project that lasted until July 1999 and the government does not appear to challenge the administrative claim related to those additional sites. The Tribe further argues the damaged sites are in remote locations that are not easily accessed and limited staffing prevents the Tribe from visiting the sites on a regular basis. Furthermore, Quechan argues the correspondence from Western that Defendant describes as "repeated attempts to consult" were actually promises

---

**5.** The Court finds Defendant's argument that the discovery rule applies to only medical malpractice cases unpersuasive based upon Ninth Circuit law applying the discovery rule to FTCA cases not involving medical malpractice.

**6.** Eligible for listing on the National Register of Historic Places.

the project would not effect cultural resources. Plaintiff maintains the government never advised the Tribe to monitor the project and, in fact, assured the Tribe the project would be monitored by an on-site archaeologist.

■ The evidence before the Court demonstrates the Tribe was notified in writing of the damage to site 7140 on March 2, 1999. *See* Lesson Learned Report. There is no evidence demonstrating Quechan was notified of any damage, in writing or otherwise, before that time. The letters the government relies upon do not notify the Tribe of any damage. Although the letters may be described as "efforts to consult" on the project, they do not demonstrate the Tribe should have known about the damage to the sites at an earlier point in time. Rather, Western assures the Tribe the cultural sites will not be effected by the project. *See* Farhat Decl., Exhs. 13 at 558, 16 at 660, 20 at 700, 21 at 702. It is unclear how assuring the sites will not be effected by the project should put the Tribe on notice of any subsequent damage. Additionally, the Court finds there is no evidence that members of the Tribe visited the sites during the project and therefore were put on notice of the damage caused to the sites.[7] Because the significance of the historical sites are not diminished by a tribe's failure to visit the sites on a regular basis, the Court rejects the government's argument that the Quechan should have known about the damage, because it placed so much value on the historical sites.

The evidence before the Court fails to demonstrate the Tribe should have known about the damage to any cultural sites prior to the March 2, 1999 notice. Accord-

ingly, Plaintiff's FTCA administrative claim of February 14, 2001 is timely. The action is not barred by the statute of limitations.

## MOTIONS REGARDING LAND OWNERSHIP AND INTEREST IN THE RIGHT–OF–WAY LANDS

Plaintiff seeks summary judgment on whether the Tribe possesses beneficial title to lands and cultural resources located on a portion of the Western transmission line right-of-way that crosses the reservation. Defendant moves for summary judgment that, as a matter of law, the United States owns the land in fee simple.

### I. Whether the Tribe Retains Property Rights to the Right–of–Way Lands

Quechan contends creation of a reservation by the United States reserves all of a tribe's pre-existing property rights in those lands. The Tribe maintains the reserved beneficial title to the reservation lands is as sacred as fee simple absolute and carries with it the full range of use and enjoyment of reservation lands. Defendant maintains a reservation is, generally, held by the United States in trust for the benefit of a tribe. The beneficial interest conferred by the trust status is considered beneficial title.

The Tribe argues the United States' creation of the Quechan Reservation subjects the United States to the strictest fiduciary responsibilities in handling that property which here includes the reservation right-of-way lands and cultural resources. As such, Western, like other federal agencies must (1) preserve and protect trust property; (2) inform the beneficiary tribe about the condition of trust resources; and (3) act fairly, justly and honestly in the utmost

---

7. Defendant suggests the Tribal President, Mike Jackson, testified an individual from the Tribal Council inspected Western's work during the time the damage occurred. However, the deposition testimony demonstrates Mike Jackson believed someone from the Tribe inspected the area. There, however, is no information on who that person was or when the inspection occurred. The evidence proffered is insufficient to confer notice to the Tribe.

good faith and with sound judgment and prudence.

Defendant argues, to proceed with its claim for damages, the Tribe must invoke a rights-creating source of law that authorizes compensation by the government for damages sustained, but has failed to do so. The United States further argues Quechan fails to cite to any case where a tribe has been able to sue the United States under the FTCA for damage to a usufructuary right. Therefore, the government argues, the Tribes's motion for summary judgment should be denied.

Plaintiff maintains this action is not a breach of trust case brought in the Court of Federal Claims, but is an action brought pursuant to the FTCA for negligence. Negligence, Quechan maintains, requires the existence of a duty.

The cases cited by the government in support of their argument the Tribe must invoke a rights-creating source of law involve cases brought by Indian tribes in the Federal Court of Claims for breach of a fiduciary duty under the Indian Tucker Act. *See United States v. Navajo Nation,* 537 U.S. 488, 123 S.Ct. 1079, 155 L.Ed.2d 60 (2003); *United States v. White Mountain Apache Tribe,* 537 U.S. 465, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003). As such, the holdings of the cited cases are not relevant to the FTCA case before this Court. Additionally, the government cites no authority for its contention Quechan must cite a case where a tribe was able to sue the United States under the FTCA or its inference the Tribe cannot seek damages under the FTCA. Therefore, the United States's request to deny Quechan's motion for summary judgment on this basis is DENIED.

## A. Whether the United States Divested the Tribe of its Interest in the Lands

■■■■ Only Congress has the power to divest an Indian tribe of its land and diminish reservation boundaries. *See Solem v. Bartlett,* 465 U.S. 463, 470, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984). "Diminishment, moreover, will not be lightly inferred." *Id.* Congressional intent to diminish the reservation must be clear from the face of the act or the surrounding circumstances and legislative history. *De-Coteau v. District County Court for the Tenth Judicial Dist.,* 420 U.S. 425, 444, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975). Any ambiguities are construed broadly in favor of the Indian tribe. *See Hagen v. Utah,* 510 U.S. 399, 422, 114 S.Ct. 958, 127 L.Ed.2d 252 (1994).

Plaintiff maintains the government never divested the Tribe of its interests in the right-of-way lands or in the cultural resources contained within the right-of-way lands. Quechan contends the evidence conclusively demonstrates (1) in 1884 the Tribe reserved beneficial title to the mesa lands; (2) in 1942 the Bureau of Reclamation reserved for itself a simple "right-of-way" over those lands for the sole purpose of construing, operating and maintaining a transmission line, which was later transferred to Western; and (3) the Tribe never gave up nor did the Secretary divest the Tribe of beneficial title. Quechan argues the 1942 right-of-way permit, the erroneous labeling on the permit map, the 1981 Secretarial Determination, and the 1983 court of federal claims settlement did not divest the Tribe of it interest in the right-of-way lands.[8] Plaintiff further argues none of the acts of 1902, 1903, 1924, 1935 or 1942 indicates clear intent to divest the

---

8. The government does not challenge Plaintiff's argument that the 1942 permit, the erroneously labeled map and the 1983 Court of

Claims settlement did not divest the Tribe of its interest in the lands. As such the Court will not address those arguments.

Quechan Tribe of beneficial title to on-reservation lands.

The Tribe also contends the government disregards the fact that the 1942 permit did not authorize the Secretary to divest the Tribe of beneficial title to the lands underlying the rights-of-way. Instead, the Tribe maintains, the government argues the Secretary acted under authority of the October 28, 1942 Act and retained the land at issue in fee simple not held in trust. The Tribe argues there is no evidence as to when this occurred, because (1) the Act postdates the 1942 permit by three months and the Act fails to expressly authorize divesting the Tribe of beneficial title and (2) the Secretarial Determination clearly and unambiguously reserves only a right-of-way interest, not a fee interest, except as to works and appurtenances.

The United States maintains the Secretary of the Interior ("Secretary") had the authority to divest Quechan of its interest in the right-of-way lands pursuant to the authority set forth by Congress in the Act of October 28, 1942 ("1942 Act"). Acting under the authority of the 1942 Act, Defendant argues, the Secretary retained the land at issue in fee simple not held in trust for the Tribe through the 1981 Secretarial Determination ("1981 Determination"). Additionally, Defendant argues Quechan should be required to exhaust its administrative remedies as any dispute to the Secretary's Determination must be brought to the Secretary of the Interior. Additionally, the government contends the Plaintiff is barred from challenging the grant of fee title to the United States by claim preclusion and estoppel.

**1. Whether Plaintiff's Claims are Barred**

**a. Exhaustion**

■ Defendant argues Plaintiff should be required to exhaust its administrative remedies before the court accepts arguments that go beyond the plain language of the secretarial determination. "When a statute or agency rule demands exhaustion of administrative remedies, 'the federal courts may not assert jurisdiction to review agency action until the administrative appeals are complete.'" *Joint Bd. of Control of Flathead, Mission and Jocko Irrigation Districts v. U.S.*, 862 F.2d 195, 199 (9th Cir.1988) (citing *White Mountain Apache Tribe v. Hodel*, 840 F.2d 675, 677 (9th Cir.1988)). The Determination states "a survey of the locations and extent of the areas occupied by the works and rights-of-way...will be made...and the results of the survey shall be reported to the Tribe, with any dispute referred to the Secretary for resolution." 1981 Secretarial Determination, Tribe's Exh. 14 at 82, Govt's Exh. 16 at 161.

Defendant maintains any challenge that goes beyond a plain language interpretation of the determination is a challenge to the Secretary's decision-making process and should go to the Secretary pursuant to the Secretarial Determination. Plaintiff maintains the government mischaracterizes its case. The Tribe asserts it does not challenge the validity of the 1981 Secretarial Determination, but challenges Western's present interpretation of the Gila–Knob right-of-way as somehow stripping the tribe of beneficial title to wide strips of land and all property interest in the Tribe's cultural resources that are located on those lands. Plaintiff contends neither the Secretarial Determination nor principles of administrative law require the Tribe to refer the issue of whether it retains beneficial title to the Secretary of the Interior and maintains the legal issue at hand, the interpretation of the Secretarial Determination, is ripe for summary judgment.

■ In reply, the United States provides a copy of a survey produced pursuant to the Secretarial Determination. De-

fendant maintains the survey, completed in 1988 demonstrates the United States owns a 100–foot wide right-of-way in fee simple. Defendant asserts that if the Tribe disputes the survey, the Tribe is required to exhaust administrative remedies pursuant to the Determination. The Court finds Quechan does not dispute the location and extent of the right-of-way or the Secretary's decision-making process, but disputes whether it is held in fee or trust. Therefore, the Tribe is not required to exhaust administrative remedies.

**b. Preclusion**

The United States argues claim preclusion bars Quechan's challenge to the grant of fee title to the United States as set forth in the Secretarial Determination, because the Tribe agreed to drop any claim against the United States challenging ownership in the Reservation when they entered into the settlement agreement in Docket 320.

■■■ Res judicata, or claim preclusion, " 'treats a judgment, once rendered, as the full measure of relief to be accorded between the parties on the same claim or cause of action." ' *Hydranautics v. Film-Tec Corp.*, 204 F.3d 880, 887 (9th Cir.2000) (quoting *Robi v. Five Platters, Inc.*, 838 F.2d 318, 321 (9th Cir.1988)). An action is barred by res judicata where "(1) the prior litigation involved the same parties or their privies, (2) the prior litigation was terminated by a final judgment on the merits, and (3) the prior litigation involved the same 'claim' or 'cause of action' as the later suit." *Id.* at 888. A settlement may have claim preclusive effect if the parties intend so. *Arizona v. California*, 530 U.S. 392, 414, 120 S.Ct. 2304, 147 L.Ed.2d 374 (2000).

Defendant contends, the Tribe brought two claims in Docket 320, (1) the 1893 agreement was invalid and the United States was liable for trespass for the years the Tribe was denied ownership, and (2) the 1893 agreement was valid and the United States was liable for uncompensated taking of the land. The government maintains after lengthy negotiations the United States and the Tribe agreed on a 15 million dollar settlement. Defendant argues the Tribe cannot challenge the United States when they receive a favorable settlement disposing of the claim in Docket 320 and then bring the same claim in another case.

The Tribe contends, although settlement agreements may have preclusive effect, claim preclusion does not bar this case, because it is not clear from the language of the settlement agreement that the parties intended the "settlement and judgment entered thereon to adjudicate once and for all the issues raised in that action." Opp. at 23. Quechan also argues Docket 320 did not involve the same claim at issue here. Specifically, the Tribe argues (1) the statements do not show the Claims Court addressed the same issue presented in this matter; (2) the issue presented here does not constitute a claim the Tribe could have conceivably asserted with respect to the claims in Docket 320; (3) the claims court did not address the authority under which the United States acquired the Gila–Knob right-of-way; (4) the Secretarial Determination did not raise the red flag that the United States was trying to divest the Tribe of beneficial title to the reservation right of way lands; (5) Docket 320 is not a tort claim, did not involve the Tribe's property and non-property interests in cultural resources, and did not litigate or settle the issue presented here of whether the Tribe was divested of property and non-property interests in the cultural resources along Western's right of way.

In reply, Defendant argues the takings claim of Docket 320 did address the right-

of-way listed in the Secretarial Determination.

The language in the judgment reads:

Entry of this final judgment shall finally dispose of all rights claims or demands which plaintiff has asserted or could have asserted with respect to the claims in Docket 320 and plaintiff shall be barred thereby from asserting any further rights, claims, or demands against the defendant and any future action on the claims encompassed on Docket 320.

Govt's Exh. 21 at 222.

Because the parties do not dispute privity, the Court finds from the judgment entered in Docket 320, the settlement in Docket 320 was intended to have preclusive effect. The Court must determine whether the claims resolved in Docket 320 are the same at issue before this Court.

The Tribe filed a claim in the Court of Claims in 1951 against the United States seeking relief under two mutually exclusive grounds for relief, namely (1) trespass damages for the United States' use of the lands subject to the 1893 agreement, because the agreement was void and the Tribe retained title to the lands, or in the alternative, (2) damages for uncompensated taking of the land pursuant to the valid 1893 agreement. *See Arizona,* 530 U.S. at 403–4, 120 S.Ct. 2304. Judgment was entered on August 9, 1983 in the amount of $15 million based upon the parties' compromise and settlement. *See* Final Judgment, Govt's Exh. 21 at 222.

As noted by the Tribe, no documents submitted by the parties demonstrate Docket 320 resolved or even contemplated the title issue of the rights-of-way involved here. In fact, the only discussion in the settlement documents regarding title or the nature of the land held by the United States and others is the measure of damages considered by the parties in Docket 320. The parties stipulated that the measure of damages for permanent takings was

fair market value of the land. Govt's Exh. 21 at 226. The parties, however, did not stipulate to the measure of damages for temporary takings. *See id.* at 228–229. There is no evidence the parties specifically allotted portions of the $15 million settlement amount for temporary and permanent takings. Moreover, the only evidence from Docket 320 discussing permanent takings is Quechan's Memorandum of Contentions of Fact and Law, which includes a list of permanent takings. As demonstrated by the Tribe, the right-of-way at issue in this matter is not listed in the permanent takings list. *See* Plaintiff's Memorandum of Contentions of Fact and Law, Govt's Exh. 18 at 189–193.

 Based upon the undisputed evidence before the Court, the settlement in Docket 320 did not include the determination of the title of the right-of-way at issue here. Accordingly, Quechan's claims regarding ownership of the land are not barred by claim preclusion.

### c. Estoppel

Defendant argues the Tribe should be judicially estopped from challenging the United States' ownership of the land in fee, because Quechan has maintained in legal pleadings and memoranda to the Court that the United States owns the land in fee. Additionally, Defendant maintains Quechan has argued the Secretarial Order is valid and binding, and a final determination of land ownership for 25 years. In support, the United States relies on the Tribe's opposition brief filed in the *Arizona* litigation, which reads,

Solicitor Krulitz' opinion was given full legal effect by a Secretarial Order which formally recognized the Quechan's title to lands within the original Reservation boundaries but which excluded from that recognition various third party interests

granted by Congress and the Department during the 1936 to 1978 period. Govt's Exh. 17 at 168–69. The opposition further reads "[r]esolution of the title issue allowed the Tribe to then settle its claims in Docket 320 for the taking of those third-party interests." *Id.* at 167. Defendant further contends the Tribe agreed to recognize and waive any challenge to the validity of the 1981 Secretarial Determination, "without reservation." *Arizona* Settlement Agreement, Govt's Exh. 24 at 251, Letter from Frank Jozwiak to Vince Farhat dated May 16, 2005 at 3. Defendant argues Quechan's argument that the Secretary of the Interior did not have the authority to grant the land to the United States is "clearly inconsistent" with its former position and to accept the argument would result in an unfair advantage.

The Tribe argues it is not judicially estopped from asserting beneficial title, because it never conceded or even implied the United States holds fee simple absolute to the reservation right-of-way lands. Quechan maintains the statements from the *Arizona* litigation relied upon by Defendant demonstrate the Tribe merely confirmed various third party interests. The Tribe further argues the Defendant's unsupported statements that Quechan previously maintained the United States owns the land in fee simple fail to trigger judicial estoppel.

▉▉▉▉ "Judicial estoppel, sometimes also known as the doctrine of preclusion of inconsistent positions, precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position." *Rissetto v. Plumbers and Steamfitters Local 343*, 94 F.3d 597, 600 (9th Cir.1996). "Because it is intended to protect the integrity of the judicial process, it is an equitable doctrine invoked by a court at its discretion." *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir.1990). The Supreme Court articulated certain factors a court may consider in determining whether to apply judicial estoppel, including:

> First, a party's later position must be "clearly inconsistent" with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled, and thus poses little threat to judicial integrity. A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*New Hampshire v. Maine*, 532 U.S. 742, 750, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001) (internal citations omitted). The list is neither inflexible nor exhaustive. *See id.*

▉▉▉ The Court finds estoppel applies. The undisputed evidence before the Court demonstrates Quechan asserted the validity of the Secretarial Determination and recognized various third party interests. More telling is Plaintiff's agreement to recognize and waive any challenge to the Determination "without reservation." Quechan's current position, namely, the United States does not own the right-of-way lands in fee simple and the Secretary was without the authority to divest it of its interest in the right-of-way is "clearly inconsistent" with its prior position that the Secretarial determination is valid. Accordingly, judicial estoppel is applicable.

Even assuming the Tribe is not challenging the validity of the Secretarial Determination, the Court finds, as discussed below, based upon the 1942 Act and the language of the Secretarial Determination, the United States holds title to the right-

of-way in fee simple absolute, not held in trust for the Tribe.

### 2. 1942 Act

The 1942 Act granted the United States authority to acquire "such right, title, and interest of the Indians as may be required in and to such tribal and allotted lands" necessary for the construction of the Parker Dam Power Project. Act of October 28, 1942, *Acquisition of Indian Lands for Parker Dam Power Project,* Government's Exh. 31 (Douthit Decl.). The Act further granted the Secretary the authority "to perform any and all acts and to prescribe such regulations as he may deem appropriate to carry out the provisions of [the] act." *Id.* Defendant argues the 1942 Act provided the Secretary the authority to divest Quechan of its interest in right-of-way lands. The Tribe argues the Act fails to mention the Fort Yuma Reservation or expressly authorize divesting of Indian beneficial title of a permit for a right of way or easement and postdates the 1942 permit.[9]

▇▇ This Court finds the plain language of the 1942 Act expressly confers to the Secretary of the Interior the authority to acquire "such right, title and interest" in the Indian land necessary for the Parker Dam Power project. It also gave the Secretary authority to perform "all acts" he deemed appropriate. The Court finds the clear, unambiguous language authorizes the Secretary to acquire title in the land by divesting the Tribe of its interests in the land. The Court does not find the failure to mention the Fort Yuma Reservation by name as fatal, as the Act specifically refers to Indian land and the Parker Dam Power Project.

Because the Court finds the 1942 Act authorized the Secretary to divest the

Tribe of its interest in its land, the Court must now look to the language of the Secretarial Determination to ascertain whether the Secretary did, in fact, divest the Tribe of its interests.

### 3. Interpreting the Secretarial Determination

#### a. Plaintiff's Arguments

Quechan argues there is no language in the Determination that clearly and unambiguously divests the Tribe of beneficial rights to the reservation right-of-way lands and cultural resources. Plaintiff contends the Determination rectified prior confusion about Reservation boundaries caused by the 1893 Agreement between the United States and the Tribe, acknowledged the western reservation lands were not ceded back to the government and carved out "Exceptions and Conditions" ("section 3.d") which confirmed third-party and government interests in Reservation lands. The Tribe argues section 3.d does not expressly state the right-of-way is not held in trust and, therefore, does not strip Quechan of beneficial title to the 100–foot wide powerline right-of-way and 50–foot access roads. The Tribe maintains there is no clear intent to divest the Tribe of beneficial title to a 100–foot wide strip of land across the reservation, or to 50–foot wide access roads.

Plaintiff argues the Determination retroactively recognized that all lands previously managed by the BLM or BOR were "held in trust by the United States for the Quechan Tribe of the Fort Yuma Indian Reservation as of January 9, 1884." Tribes Exh. 14 at 77–78.; Govt's Exh. 16. As such, Quechan argues the language of the Secretarial Determination unambiguously reserves only a right-of-way interest,

---

**9.** The date of the permit is unclear, however, the United States contends the right-of-way was approved on July 23, 1942. *See* State-

ment of Material Facts in Support of Government's Motion for Partial Summary Judgment Regarding Land Ownership.

except as to works and appurtenances and lands occupied by all of said works and appurtenances. Quechan maintains this interpretation makes sense because (1) the BOR and Western paid for and constructed the "works and appurtenances" and logically wanted these improvements back after abandoning the right-of-way, and (2) Western also needed to preserve its right to access the project for maintenance. Furthermore, Quechan argues, Western's equitable title to works and appurtenances, and to the lands occupied by the works and appurtenances reverts to the Tribe *only* if the Tribe owns equitable title "to all lands immediately adjoining said works." The Tribe contends that if the Determination terminated the Tribe's equitable title to wide bands of Reservation land, then the Tribe could *never* obtain equitable title to the lands "immediately adjoining" Western's works. As such, this interpretation would nullify the Determination's reversion provision, a result that is prohibited by traditional canons of statutory construction.

Plaintiff maintains the Government ignores every other provision of section 3 that contradicts its theory. Quechan asserts Western's BLM permit No. LA 055165 for a "right-of-way" is included in the proceeding section that lists "existing permits, leases, rights-of-way and other non-fee rights and interests." In contrast, Section 3.d.(12) lists the structure, the Parker–Davis 161 Kv Transmission line, not a right-of-way, in the list of "works and appurtenances" and "lands occupied by all of said works and appurtenances" in which the United States holds fee title. Quechan argues, the plain meaning of the term "works and appurtenances" refers only to power lines, poles and the land (or holes) in which the poles are placed. That, coupled with the right of way identified in 3.b.(17), is all that is needed to construct, operate and maintain the Gila–Knob line. According to Plaintiff Section 3.d reserves

"the right of the United States, its licensees and contractors to operate, maintain and reconstruct said works and appurtenances" which includes the Parker–Davis powerline at 3.d.(12). This reservation would be unnecessary if the United States owned the right-of-way and access roads in fee.

Plaintiff also argues the United States ignores Indian law canons of construction. Quechan maintains the Determination is silent on whether the Tribe conveyed to the government beneficial title to the right-of-way lands and cultural resources. That silence, the Tribe contends, is not evidence of its involuntarily alienated beneficial title. Plaintiff also argues any ambiguities of the Determination should be read in favor of the Tribe, following the Indian law canons. As such, the Tribe maintains the Determination should be interpreted as confirming the United States holds no more than what is practically needed to operate and maintain the transmission line, an ordinary right-of-way.

Quechan goes on to argues the 1981 Determination could not give more rights than the Government held under the 1942 permit. The Tribe asserts the United States ignores the limited authority for and terms of the 1942 permit and subsequent amendments which formed the original basis for Western's rights-of-way. The Tribe argues the 1924 statute that authorized the secretary to issue the 1942 permit does not expressly or impliedly grant the Secretary the authority to divest the Tribe of beneficial title or even mention "fee simple." Likewise, Quechan argues, the 1942 permit did not expressly or impliedly divest the Tribe of beneficial and non-property interests in the right-of-way. The Tribe maintains the 1924 statute and the 1942 permit granted a simple right-of-way.

### b. Defendant's Arguments

The United States argues the plain, unambiguous language of the Secretarial Determination grants Western fee title to the right-of-way land. Defendant argues Section 3.d.(12) reserves to the United States in fee title not held in trust for the Tribe, lands occupied by all work and appurtenances including, but not limited to Parker–Davis 161–Kv Transmission line. Defendant further maintains the Determination provides that the extent and location of the right-of-way shall be set forth in a survey, and the survey, completed in 1988, holds the United States owns a 100–foot wide right of way in fee simple not held in trust. The government argues the 100–foot right-of-way is consistent with the plain language of the Determination.

Defendant further argues the Tribe employs a strained reading of the Secretarial Determination, when suggesting the United States only owns fee title in the land in which the transmission line poles are placed. The government contends the Tribe's interpretation contradicts the plain, unambiguous language of the Secretarial interpretation, specifically, "the line traverses the area crossing the Colorado River westerly to the Pilot Knob substation." The United States contends it is a line that traverses and crosses, not just poles and holes on which the lines are placed. As such, Defendant argues the language of the permit demonstrates the transmission line is more than the poles and the holes in which the poles are placed.

### c. Analysis

The Secretarial Determination is organized in four sections. Section 1, entitled "Solicitor's Opinion", sets forth the 1978 Solicitor's opinion that recognized the reservation's boundaries as those established by the 1884 Executive Order, as modified by the Executive Order of December 19, 1900. Tribe's Exh. 14 at 77, Govt's Exh. 16 at 155–56. Section 2, entitled "Recogni-

tion of Trust Status of Lands", states all lands within the Reservation are held in trust by the United States for the Quechan Tribe. *Id.* at 77–78; Govt's Exh. 16 at 156. Section 3, entitled "Exceptions and Conditions", discusses the Solicitor's holding that certain valid rights were acquired prior to 1884, various reclamation projects were constructed on the Reservation and valid grants were made after 1893, and holds recognition of Tribal title is subject to those rights. *Id.* at 78; Govt's Exh. 16 at 156. Section 3, which is pertinent to the issue before the Court, contains a list of third-party rights, including permits, leases, rights-of-way and other non-fee interests. *Id.* Section 4 is entitled "Miscellaneous Provisions."

Section 3 reads, in relevant part,:

b. All rights of third parties to such lands within the now-recognized reservation boundaries which were established pursuant to law prior to December 20, 1978, including but not limited to existing permits, leases, rights-of-way and other non-fee rights and interests, including those generally described in subparagraphs (1)-(44) following.

(17) BLM Permit No. LA055165 for a right-of-way for "Gila drop # 4" power transmission line and access road, approved July 23, 1942, pursuant to Act of December 5, 1924 (43 Stat. 672); amended May 19, 1971 . . .

c. . . . As to all rights-of-way listed above which are not on lands listed in Paragraph d of this Section as fee lands of the United States not held in trust for the Quechan Tribe and which were issued under the assumption that the lands involved were not Indian lands, I hereby grant a right-of-way pursuant to the authority vested in me by the Acts of February 5, 148, 62 Stat. 17, 25 U.S.C. 323–28, each such grant being for the unexpired term of the original grant

and subject to precisely the same terms and conditions as contained in the original grant...

d. There is hereby excepted from the provisions and effect of Section 2, hereof, fee title in the United States without being held in trust for the Quechan Tribe to the works and appurtenances, including but not limited to the works described in the following subparagraphs 1 through 18...and fee title in the United States, without being held in trust for the Quechan Tribe, to lands occupied by all of said works and appurtenances and there is also reserved the right of the United States, its licensees and contractors, to operate, maintain, and reconstruct said works and appurtenances, including but not limited to:

> (12) Paker–Davis 161–Kv Transmission Line. This line traverses the area from its crossing of the Colorado River westerly to the Pilot Knob Substation...

Govt's Exh. 16 at 156–160.

The language is clear and the parties agree the works and appurtenances of the transmission line are held in fee not in trust for the Tribe. The parties dispute, however, the plain meaning of "lands occupied by all of said works and appurtenances..." Plaintiff maintains it refers only to the lands in which the poles are placed. Defendant contends it refers to the 100 foot wide right-of-way provided for in the survey. The Court finds the plain language of the determination refers to the lands occupied by the works. The determination goes on to state "[a] survey of the locations and extent of the areas occupied by the works and rights-of-way...will be made as promptly as possible by the United States..." *Id.* at 161. The survey completed in 1988, calls for a 100 foot wide right-of-way. Govt's Exh. 52.[10] The survey is silent as to whether the right-of-way is held in trust.

The Court agrees with the government that Quechan employs a strained reading of the Determination. Section 3.d. excepts fee title to the United States without being held in trust for the Quechan Tribe lands occupied by all of said works and appurtenances and refers to the transmission *line,* which "traverses *the* area." (Emphasis added). This language clearly states the land held in fee not in trust for the Tribe is more than just the land actually occupied by the poles. Additionally, section 3.c which states "[a]s to all rights-of-way listed above which are not on lands listed in paragraph d of this Section as fee lands of the United States not held in trust for the Quechan Tribe...I hereby grant a right-of-way...subject to precisely the same terms and conditions as contained in the original grant" further supports the government's assertion the subject right-of-way is held in fee not in trust for the Tribe. Govt's Exh. 16 at 159. The language "right-of-way listed above" refers to section 3.b. The language of 3.c suggests the rights-of-way listed in 3.b that are not listed in 3.d are not held in fee, while those listed in both 3.b and 3.d are held in fee not in trust for the Tribe. The transmission line at issue is listed in both.

---

**10.** Plaintiff requests the Court disregard the United States' arguments related to the survey and the survey related documents, because the survey was produced well after close of phase one discovery, and because the survey documents are incomplete. *See* Surreply at 1. The Court, however, finds the survey relevant to the issues at hand and counsel for Defendant maintains he just recently learned the final survey was completed and approved. Additionally, if Plaintiff believes the survey is incomplete, Plaintiff should seek to introduce the portions of the survey it believes are relevant and necessary to the Court's determination. *See* Fed.R.Evid. 106; *Milton H. Greene Archives, Inc. v. BPI Communications, Inc.,* 378 F.Supp.2d 1189.

With regard· to the reversion provision, section 3.d which mandates equitable title to the works and rights-of-way revert to the Tribe if they are abandoned or "cease to be used in connection with authorized Reclamation projects" where Quechan "owns equitable title to all lands immediately adjoining said works," the Court finds this section mandates Quechan must hold equitable title to the lands adjoining the right-of-way. *See* Govt's Exh. 16 at 161. Again, the Tribe employs a strained reading of the Determination.

Because the Court finds the language of the Determination and surrounding circumstances clear and unambiguous, the Court holds the United States retains the 100–foot right-of way in fee title not held in trust for the Tribe.

**B. Other Sources of the Tribe's Proprietary Interest**

**1. Unique Nature of Cultural Property**

 The Tribe argues it holds a property interest in the right-of-way lands by the unique nature of cultural property. Relying on various law review and law journal articles, the Tribe argues the reservation right-of-way lands with ancient trails, cleared circles, cobble clusters, petroglyphs and other unique features created by Quechan ancestors are cultural property, in which it retains a proprietary interest.

The government argues this argument fails, because it is without basis in law and the Tribe cannot retain an interest in federal fee land.

In reply, Plaintiff cites to *Chilkat Indian Village v. Johnson*, 870 F.2d 1469 (9th Cir.1989) in support of its contention they retain a property interest. The Chilkat Indian Village, which owns fee land in and around the town of Klukwan, attempted to sue various individuals in federal district court for violating a Village ordinance and federal law by removing Native artifacts

from Klukwan. The Ninth Circuit affirmed in part and reversed in part the district court's dismissal for want of jurisdiction. The case involved no discussion regarding an Indian tribe's proprietary interests in land held in fee by the government that contains artifacts.

This Court does not find the journal and law review articles persuasive authority and the Tribe cites to no case law or other persuasive authority for its position that the nature of the cultural artifacts provides them a proprietary interest in the right-of-way lands. The Court's own research located no cases or statutory law. In fact, the Court found support for the opposite proposition. *See Pit River Tribe v. Bureau of Land Management*, 306 F.Supp.2d 929, 950 (E.D.Cal.2004)("[t]hat the land is spiritually important to the Tribe also does not change the federal government's ownership of the land.").

As such, Quechan's interest in cultural property located within the fee land does not provide Quechan with any proprietary interest in the land.

**2. Tribal law**

Quechan argues Tribal law confirms the Tribe's property rights in cultural resources. The Tribe cites to its Constitution and Law and Order Code in support. The Tribe's Constitution states one purpose of the Tribe is "to do all things which will gain, or serve to gain for the people of the Quechan Tribe a richer culture." Pla's Exh. 33 at 476, Constitution of the Quechan Tribe. Additionally, Plaintiff demonstrates the Quechan Constitutional authorizes the Tribal Council "to prevent the sale, disposition, lease of incumbrance of tribal lands, interests in lands, or other tribal assets..." *Id.* at 479. The Tribe argues the Quechan Law and Order Code requires the application of tribal law and custom to all matters within the Tribe's jurisdiction. Pla's Exh. 29 at 397, Quechan

Law and Order Code. Pursuant to the Law and Order Code, Quechan's jurisdiction extends to all lands within the exterior boundaries of the Reservation. *Id.* at 392. Plaintiff maintains the Law and Order Code confirms the Tribe's property interest in cultural property and protects property from harm. *See Id.* at 394, 405, 408, 408a. (Definition of property; Exclusion of non-members from the Reservation for various acts including causing physical loss or damage to tribal property; criminal offenses include causing substantial harm to public interests and trespass).

The government argues the cultural resources here are on United States land, while the Code applies to on-reservation cultural resources, and Indian title is a matter of federal law.

In reply, Plaintiff directs the Court to 18 U.S.C. § 1151 that provides Indian country comprises "all land within the limits of any reservation...not withstanding the issuance of any patent, and including rights of way running through the reservation." Plaintiff argues Quechan Law similarly, does not exempt federal fee lands from tribal jurisdiction.

 As discussed above, the United States holds the land at issue in fee not in trust for the tribe. The Tribe provides no authority for its position that its law bestows a proprietary interest in federal fee land located within the reservation boundaries. The Court's own research located none. Additionally, the Tribe's reliance on the definition of Indian country in 18 U.S.C. § 1151 is misplaced. The cases discussing and involving application of section 1151 involve jurisdiction and entail no discussion regarding providing a tribe with an interest in land or cultural resources. The Court found no authority for the contention that a tribe's exercise of jurisdic-

tion on fee land within a reservation boundary changes the character of the fee land to tribal land. *See Pit River Tribe,* 306 F.Supp.2d at 950 ("That the Tribe asserts jurisdiction over the Highlands is an internal tribal matter and does not turn the Highlands into tribal land."). Accordingly, tribal law provides Quechan no proprietary interest in the right-of-way lands held in fee by the United States. Furthermore, the Court finds the tribal law cited by Plaintiff does not explicitly provide the tribe a proprietary interest in cultural resources located on land within the exterior boundaries but held in fee by others.

### 3. Federal Law

Quechan argues federal law confirms it retained beneficial title to on-reservation cultural resources located within the right-of-way. The Tribe cites primarily to the Native American Graves Protection and Repatriation Act ("NAGPRA") which recognizes tribal property rights in cultural items found on tribal lands, and the American Indian Religious Freedom Act ("AIRFA"), which is a policy to protect and preserve the Indian's right of "freedom to believe, express and exercise the traditional religions", including the right to access sites and use sacred sites.[11]

The government argues Plaintiff's contention is inapplicable, because the sites are on fee land. Additionally, Defendant argues the sites at issue do not qualify for protection under NAGPRA.

 The Tribe argues the United States ignores all the laws cited, but NAGPRA. The Tribe further argues NAGPRA broadly applies to "tribal lands" which are "all lands within the exterior boundaries of an Indian reservation." 25 U.S.C. § 3001(15). The Court agrees NAGPRA

---

**11.** Quechan suggests there is a "web of federal cultural resource protection laws" that

confirms a tribes rights to cultural resources, but only cites to NAGPRA and the AIRFA.

confirms a tribe's interest in cultural property eligible for protection under the laws. *See* 25 U.S.C. § 3002. However, even if Quechan retains an interest in the cultural property eligible for protection under NAGPRA, there is no authority that NAGPRA provides an Indian Tribe beneficial title to the right-of-way held in fee by the United States.

 AIRFA is a policy that does not create a private right of action nor does it confirm any property rights in cultural property. *See Lyng v. Northwest Indian Cemetery Protective Ass'n,* 485 U.S. 439, 455, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988).

**4. Tribe's Trust Relationship with the Federal Government**

The Tribe argues it retains beneficial title to on-reservation cultural resources by virtue of the Tribe's trust relationship with the federal government. Quechan maintains a property interest is an element of every trust. The Tribe argues the United States assumed "comprehensive control" over on-reservation cultural resources and all necessary elements of a common law trust exist: (1) a trustee; (2) a beneficiary; and (3) a trust corpus.

 Defendant argues the Tribe has failed to satisfy the elements of a trust as set forth in the Restatement of Trusts because the United States does not hold the land in trust for the Tribe. Because the Court finds the United States holds the land in question in fee not in trust for the Tribe, this argument fails.

**C. Whether the Tribe Retained Non–Property Rights to the Cultural Resources within the Right-of-way Lands**

Quechan argues it reserved its preexisting usufructuary rights to conduct all activities that were and are integral to the Tribe's way of life upon creation of the Reservation by the United States. The Tribe maintains on-reservation usufructu-

ary rights exist regardless of whether the Tribe holds actual title to the lands.

Usufructuary rights provide the holder the right to use or enjoy the property without any ownership interest. The government argues Quechan does not have a cause of action for usufructuary rights to cultural resources. Defendant further contends the Tribe cites no case where a tribe has been held to have usufructuary rights to use and access cultural resources on federal fee land. The United States relies upon *Lyng v. Northwest Indian Cemetery Protective Ass'n,* 485 U.S. 439, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988) to support its position. In *Lyng,* the Court found the free exercise clause of the first amendment did not prohibit the government from allowing timber harvesting and road construction through a portion of a national forest traditionally used by Indians for religious purposes. The court in *Lyng* denied the tribe's right to use the land held by the government for religious purposes although the land was traditionally used by the tribe for religious purposes. The government argues, the Court's reasoning in *Lyng* is more compelling here, because unlike *Lyng,* there is no evidence that Quechan Tribal members used the cultural sites. The United States also contends the Tribe's argument is unclear, asserting that a review of the cases cited in support of its argument suggests it is arguing case law that addresses a tribe's rights to hunt and fish on non-federal, non-reservation land are analogous to the matter before the Court.

In reply, the Tribe distinguishes the *Lyng* case from this matter, stating *Lyng* involved a dispute over off-reservation public lands. The Court in *Lyng,* the Tribe asserts, rejected the notion that third parties could use religious practices to obtain " "de facto" beneficial ownership of some rather spacious tracts of public

property." *Lyng,* 485 U.S. at 453, 108 S.Ct. 1319. Here, the Tribe argues, Western's right-of-way is not located within public lands but on Indian land within an Indian reservation. The Tribe also addresses the United States' argument that its members did not utilize the sites unlike the Indian tribe in *Lyng,* explaining the damaged sites are remote, the number of Quechans that practice traditional religion is likely small; visiting the sites is not critical to practicing traditional Quechan ways, most Quechans are unaware of site boundaries and numbers and thus probably could not accurately tell counsel for the United States exactly which "sites," if any, they had visited, and Quechan testimony about site visits may be unreliable because Quechans are by nature extremely reluctant to freely share traditional practices with non-members.

■ The Court finds that to the extent Plaintiff argues it was never divested of its beneficial title to the right-of-way lands and therefore retains usufructuary rights, this argument fails, because this Court has found that the Secretary divested the Tribe of its interest in the right-of-way lands.

The Tribe maintains the government fails to demonstrate how the Tribe was divested of its usufructuary rights which were reserved in 1884 upon the establishment of the reservation. Plaintiff also argues that it has usufructuary rights to access the cultural resources on the right-of-way lands regardless of who owns title. The cases cited by Plaintiff in support of its contention that it retains usufructuary rights discuss the language of treaties that reserved certain rights to hunt, fish and gather on off-reservation lands. In *United States v. Winans,* 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089 (1905), the Supreme Court recognized that "the right of taking fish at all usual and accustomed places" reserved in a treaty with the Yakima Indi-

an Tribe was "intended to be continuing against the United States and its grantees as well as against the state and its grantees." at 381–82, 25 S.Ct. 662. The action in *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt,* 700 F.2d 341, 343 (7th Cir.1983), involved a band of the Lake Superior Chippewa Indians' treaty which recognized hunting, fishing, trapping and gathering rights in public lands in Wisconsin. The Court in *Lac Courte Oreilles,* held "[t]reaty-recognized rights of use, or usufructuary rights, do not necessarily require that the tribe have title to the land." *Id.* at 352. Additionally, sixteen Indian tribes in the state of Washington brought a case seeking a declaration of rights to shellfish under certain treaties in *United States v. State of Washington,* 157 F.3d 630 (9th Cir.1998). The court found the treaties granted the tribes a right to take shellfish from "within the Tribes' usual and accustomed fishing areas, except as expressly limited by the Shellfish Proviso." *Id.* at 644.

In the aforementioned cases, Indian tribes retained usufructuary rights via express language in the rights-creating source of law. In the instant case, Plaintiff's reservation lands were established by an executive order not a treaty. The Ninth Circuit recognizes a tribe's rights are entitled to the same protection against *non-federal interests* whether they are derived from a treaty, executive order or statute. *See Parravano v. Babbitt,* 70 F.3d 539, 545 (9th Cir.1995) (emphasis added).

The Court's own research did not locate any case in which an Indian tribe was held to retain executive order-derived rights to use or access cultural property held in fee by the federal government. Even if executive order-derived rights are entitled to protection against federal interests, there is no language in the executive order es-

tablishing the Reservation that expressly reserves to the Tribe the right to access cultural property on federal land held in fee.

### D. Whether Plaintiff's Claims for Damage to Property Survive

The government argues the Tribe's claims should be dismissed to the extent they assert claims for damage to property held by the United States in fee title. Defendant maintains all the Tribe's claims rely in whole or in part, on a determination that the Tribe owns the land. The government contends that, should the Court find the United States owns the land in fee, the Tribe's claims should be dismissed.

Quechan argues its claims should not be dismissed. The Tribe argues it has non-property interests in the right-of-way lands and cultural resources and sites. Plaintiff maintains the claims for public and private nuisance and negligence claims do not require the Tribe have property interests in the destroyed cultural resources. The Tribe maintains it fulfills the elements of a nuisance claim provided it shows that the United States' destruction interferes with the comfortable enjoyment of the Tribe's property. As such, according to Plaintiff, the success of Quechan's nuisance claim does not rise and fall on whether the land is held in fee. Furthermore, some of the claims are for destruction of cultural property outside the right-of-way.

### 1. Nuisance Claims

Plaintiff contends nuisance claims require only interference with a plaintiff's enjoyment of his property and a nuisance can occur outside the boundaries of a plaintiff's property. Defendant contends the Tribe may have a narrower claim of nuisance if they prove the United States actions on the land interfered with the Tribe's use and enjoyment.

Nuisance claims do not rely upon damage to an individual's property, but require interference with a plaintiff's use and enjoyment of his or her property. *San Diego Gas & Electric Co. v. Superior Court,* 13 Cal.4th 893, 937, 55 Cal.Rptr.2d 724, 920 P.2d 669 (1996). The Court's holding that the United States owns the land is not fatal to Plaintiff's nuisance claim. Accordingly, the government's motion to dismiss the nuisance claim is DENIED.

### 2. Negligence Claims

Plaintiff argues negligence requires invading someone's interest, not necessarily a property interest. The Tribe maintains the United States interfered with the Tribe's right to ensure the protection of on-reservation and cultural resources; and to perpetuate the Tribe's culture and history and to practice its religion free from tortious harm.

Defendant maintains proof of negligence requires the proof of four elements, one of which is duty. Defendant argues the United States has no duty for actions taken on fee property, so the negligence claims should be dismissed.

In reply, Plaintiff argues the government's argument that it has no duty to protect cultural sites on federal fee land within an Indian reservation fails, because it cannot point to a federal cultural resource statute that exempts federal fee lands from the law's protective ambit.

Because the negligence claims do not rise and fall upon the ownership of land, the Court's holding the United States owns the land is not fatal to the negligence claims.[12] As such, Defendant's motion to dismiss the negligence claim is DENIED.

---

12. Any discussion of whether the United States owed a duty to the Tribe is addressed infra on the merits of Plaintiff's remaining claims.

### 3. Trespass Claims

 "A trespass is an invasion of the interest in the exclusive possession of land..." *Capogeannis v. Superior Court,* 12 Cal.App.4th 668, 674, 15 Cal.Rptr.2d 796, 799 (1993) (citing *Wilson v. Interlake Steel Co.,* 32 Cal.3d 229, 233, 185 Cal.Rptr. 280, 649 P.2d 922 (1982)). Because the Court holds the United States holds title to the right-of-way land and there is no evidence Quechan has any possessory interest in the land, the trespass claim as to the rights-of-way is DISMISSED.

## MOTIONS ON THE MERITS OF PLAINTIFF'S CAUSES OF ACTION

Plaintiff seeks partial summary judgment on the elements of negligence, gross negligence, negligence per se, and public and private nuisance. Defendant seeks summary judgment in its favor arguing the Court should dismiss the action to the extent the Tribe improperly relies on state law claims that do not have a right of action and on federal statutes for which Congress has not identified a remedy.

### I. Reliance on State Law

Defendant argues the Court should dismiss the Tribe's claims for negligence, negligence per se and gross negligence, in part, to the extent the Tribe relies on state law causes of action that are not actionable against a private individual.

 The United States is immune from suit absent any waiver. *See F.D.I.C. v. Meyer,* 510 U.S. 471, 475, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994). Moreover, "a waiver of the government's sovereign immunity 'cannot be implied but must be unequivocally expressed.'" *Cato v. U.S.,* 70 F.3d 1103, 1107 (9th Cir.1995) quoting *United States v. Mitchell,* 445 U.S. 535, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980). Under the FTCA, the United States may be sued in a tort action for actions caused by a government employee "if a private person would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). The United States is liable "in the same manner and to the same extent as a private individual under like circumstances..." 28 U.S.C. § 2674. The Supreme Court has interpreted this to mean "the United States waives sovereign immunity 'under circumstances' where local law would make a 'private person' liable in tort." *United States v. Olson,* 546 U.S. 43, 126 S.Ct. 510, 511–12, 163 L.Ed.2d 306 (2005) (reversing Ninth Circuit precedent permitting courts to base a waiver simply upon a finding the local law would make a state or municipal entity liable.)

### A. "Law of the Place"

The government maintains California law rather than Quechan or common law should apply. Quechan maintains that although California is the primary source of law, the Court should also consider two relevant Quechan laws. The Tribe argues some courts have held the FTCA's "law of the place" includes tribal law, relying on *Cheromiah v. United States,* 55 F.Supp.2d 1295 (D.NM 1999). The court in *Cheromiah* applied tribal law to a FTCA action brought by Acoma tribal members alleging medical malpractice upon finding the Acoma Tribe is the relevant political entity who controls the jurisdiction where the alleged tort occurred. The court reasoned that because a private person would be subject to the tribe's jurisdiction, tribal law should apply and looked to *Strate v. A–1 Contractors,* 520 U.S. 438, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997) and *Montana v. United States,* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981) to determine whether the Acoma Tribe could exercise jurisdiction over non-tribal members.

There is no controlling authority on the issue of whether "law of the place" in-

cludes tribal law when the act or omission occurred within the boundaries of an Indian reservation. The Ninth Circuit has applied state law to tort actions occurring within reservation boundaries without discussion. *See Bear Medicine v. United States*, 241 F.3d 1208 (9th Cir.2001) (without discussing tribal law, Montana law applied); *Seyler v. United States*, 832 F.2d 120 (9th Cir.1987) (Idaho law applied with no discussion as to whether Indian law should be applied). "Such unstated assumptions on non-litigated issues are not precedential holdings binding future decisions." *Sakamoto v. Duty Free Shoppers, Ltd.*, 764 F.2d 1285, 1288 (9th Cir.1985). As such, this Court examined authority in other jurisdictions to determine the appropriateness of applying tribal law in this FTCA action.

Two district courts in this circuit have considered the question directly and determined "law of the place" is the law of the state; *Ben v. United States*, 2007 WL 1461626 (D.Ariz.2007) and *Bryant ex. rel. Bryant v. United States*, 147 F.Supp.2d 953 (D.Ariz.2000). In *Bryant*, tribal members sued the United States under the FTCA based upon dental malpractice performed at a federal hospital located on tribal land. The plaintiffs in *Ben* were involved in a fatal, single car accident on a right-of-way within the boundaries of the Navajo reservation and sued the United States for failing to properly maintain the right-of-way. Both courts determined that state law is traditionally applied in FTCA cases involving acts or omissions on tribal land. The courts disagreed with *Cheromiah's* reliance on cases applying law other than state law for acts occurring outside the boundaries of any state. These courts also rejected the reasoning of *Cheromiah*, that because a private person would be subject to the tribe's jurisdiction, tribal law should apply, finding a similar argument rejected in *Brock v. United States*, 601 F.2d 976 (9th Cir.1979).

This Court does not find the rationale in *Ben* and *Bryant* persuasive for several reasons. First, this Court finds reliance on *Brock* in the context of Indian law issues inappropriate, because *Brock* does not deal with the unique nature of Indian law and jurisdiction or Indian sovereignty. In *Brock*, personal representatives of two individuals killed while working on the Bonneville Dam, which spans the Columbia River between Oregon and Washington, sued the United States under the FTCA. Although the negligent act occurred in Washington, the plaintiffs sued in Oregon arguing Oregon had jurisdiction over the area where the negligence occurred. The Ninth Circuit rejected the plaintiffs' argument that because a person could be sued in Oregon for negligence occurring in Washington's territorial limits, Oregon law should apply. *Id.* at 979. The court found the law of the place where the act or omission occurred is applied in FTCA cases. *Id.* at 978.

Second, *Ben* and *Bryant* cite to Ninth Circuit cases applying state law in cases involving acts occurring on Indian land without discussion of applicable Indian law. In the relied upon cases, there is no indication whatsoever as to whether there was Indian law that could have qualified as "law of the place" or whether any party asserted that Indian law and jurisdiction should have been applied. Absent reasoned discussion concerning the applicability of Indian law as the law of the place, it strains reality to assume that the law of the state shall apply. *See Sakamoto*, 764 F.2d at 1288. Furthermore, the traditional application of a rule that is supported by no reasoned precedent should not, in the this Court's view, be assumed to apply to an atypical dispute over "law of the place."

Third, and based upon the last reason stated above, this Court declines to follow various district courts which rely on cases

not involving acts within a reservation that found "law of the place" traditionally means law of the state law where the actions occurred. *See LaFramboise v. Thompson*, 329 F.Supp.2d 1054 (D.N.D. 2004) (Applied state law rather than Indian law upon finding "law of the place" means "law of the state" citing *F.D.I.C. v. Meyer*, 510 U.S. 471, 478, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994) which does not involve Indian law issues.); *Federal Express Corp. v. United States*, 228 F.Supp.2d 1267 (D.N.M.2002) (Applied state law upon finding the "overwhelming load of case law" interprets "law of the place" as law of the state, but relies upon cases not involving Indian law issues).

■ Next, the Court finds the reasoning of *Cheromiah* persuasive. The court in *Cheromiah* first looked to the plain language of the FTCA which states the United States shall be liable "in accordance with the law of the place where the act or omission occurred" and found the medical malpractice took place on Acoma tribal land. 55 F.Supp.2d at 1302. Considering the plain language of the statute, the phrase "law of the place," can only be interpreted to mean the law of a recognizable entity having jurisdiction over the site where the act occurred, which is not necessarily the "law of the state." *See* 28 U.S.C. § 1346(b)(1); *see Botosan v. Paul McNally Realty*, 216 F.3d 827, 831 (9th Cir.2000) ("Statutory interpretation begins with the plain meaning of the statute's language"). Furthermore, the Supreme Court has interpreted "law of the place" to mean "political entity." *Hess v. United States*, 361 U.S. 314, 318 n. 7, 80 S.Ct. 341, 4 L.Ed.2d 305 (1960). Indeed, any other interpretation of Section 1346(b)(1) simply

ignores without justification the political entity and thus the political sovereignty of the Tribe.[13] The actions alleged here took place in and around the right-of-ways located within the boundaries of the Quechan Indian reservation. Hence, if a private person would be held liable under Quechan law for engaging in the acts alleged here, Quechan law will apply.

■ Therefore, the Court must determine whether Quechan would have jurisdiction over a private individual engaging in the actions alleged here. Absent express federal authorization, Indian tribes retain jurisdiction over activities of non-members in limited circumstances. *Strate*, 520 U.S. at 445, 117 S.Ct. 1404. These circumstances include "(1) taxation and licensing of those who enter consensual relationships with the tribe through commercial dealing, contracts and other arrangements; and (2) civil authority to regulate non-members activities that threaten the political integrity, economic security or health and welfare of the tribe." *Montana*, 450 U.S. at 565–66, 101 S.Ct. 1245.

■ Plaintiff alleges Defendant's employees drove over and permanently scarred cultural sites on the Quechan Reservation. The preservation of the tribe's cultural heritage is significant as demonstrated by the many federal and state statutes preventing the destruction of cultural artifacts. Destruction of those cultural artifacts and sites threatens the political integrity and welfare of the Quechan Tribe. Accordingly, the Tribe has civil jurisdiction over non-Indians engaging in activities permanently scarring cultural sites.

---

**13.** Indian Tribes are recognized as political entities. *See State of Montana v. Gilham,* 133 F.3d 1133, 1135 (9th Cir.1998) ("Indian tribes have been recognized, first by the European nations, later by the United States, as distinct, independent political communities' qualified to exercise powers of self-government, not by virtue of any delegation of powers, but rather by reason of their original tribal sovereignty.")

 Plaintiff relies upon two Quechan laws in support of its claims: Quechan Law and Order Code § 13–1504(A)(4) and Quechan Law and Order Code § 10.2.2. Section 13–1504(A)(4) states a person who knowingly enters or remains unlawfully on the property of another and burns, defaces, mutilates or otherwise desecrates a religious symbol of another or other religious property without the permission of the owner commits criminal trespass. Quechan Law and Order Code, Pla's Exh. 29 at 408. This Court finds the Indian Tribe would not have jurisdiction over a non-member for violation of Section 13–1504, because Indian tribes lack criminal jurisdiction over non-Indians. *See Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978).

 Section 10.2.2. allows a non-member to be excluded from the Reservation for (E) unauthorized taking of any property from the Reservation and (F) any act causing physical loss or damage to tribal property or property of any member. *Id.* at 405. Although Section 10.2.2. falls within the scope of the Tribe's jurisdiction over non-Indians, Plaintiff does not rely directly on Section 10.2.2 for its negligence claim. Instead, Plaintiff argues it may rely on Sections 10.2.2 and 13–1504(A)(4) in support of its negligence claim under California law. The Tribe maintains the Quechan laws impose duties upon Defendant, but cites to no authority. This Court's thorough research located no cases supporting Plaintiff's argument that applying tribal law as "law of the place" allows a plaintiff to rely on tribal law to support its negligence claim under state law. Furthermore, the Court located no cases in which California law recognized a duty based upon tribal law. Accordingly, the Court will look only to California law in support of Plaintiff's claims.

## B. Private Cause of Action

Relying on the holding of *Baker v. United States,* 817 F.2d 560, 566 (9th Cir.1987), Defendant argues Quechan must allege violations of state law that have a private right of action. *Baker* involved an FTCA claim for negligence against the United States Department of Health, Education and Welfare. Upon finding the discretionary function did not bar the plaintiff's FTCA claim, the court in *Baker* remanded the matter and instructed the district court to "consider which state's substantive law applies and whether the state provides a cause of action against private parties that is analogous to the claims against the United States." *Id.* The government also cites to *Delta Savings Bank v. U.S.,* 265 F.3d 1017 (9th Cir.2001) in support of its argument that a private right of action is required. The Ninth Circuit in *Delta Savings Bank* rejected the plaintiffs' attempt to rely on California civil rights laws in support of their FTCA claim, finding the "broad statements of public policy supposedly embodied in California civil rights laws...do not...provide a cause of action." *Id.* at 1025. The Court noted that sections of the California Unruh Act forbid the denial of equal accommodations and advantages, and the Fair Employment and Housing Act ("FEHA"), which focuses on an employer's obligations, prohibits the conspiracy to deny civil rights, but found those sections would not grant a cause of action against a private defendant who committed acts allegedly committed by the United States in the *Delta Savings Bank* case.[14]

---

**14.** This Court notes both the Unruh Act and the FEHA provide for a private right of action in certain situations.

Plaintiff argues the issue of whether a state law provides a private remedy is not relevant in FTCA cases. Plaintiff further argues state statutes provide standards of care even if they do not provide causes of action in negligence per se claims. Additionally, as to negligence and gross negligence, Plaintiff maintains federal statutes can provide duties and standards of care if they are analogous to state law and state law may establish duties even if they do not provide private causes of action. Plaintiff argues the government confuses the concepts of duty and private causes of action. Citing the language of *Delta Savings Bank*, Plaintiff maintains the FTCA requires the state law impose a duty and does not require the statute to contain an express private right of action.

In further support, Plaintiff cites to an FTCA case that relies on state laws which do not provide a private cause of action. *See Clark v. United States*, 660 F.Supp. 1164 (W.D.Wash.1987) (Washington State's water pollution laws, which did not provide private causes of action), and *Vance v. United States*. 355 F.Supp. 756 (D.C.Alaska 1973). The court in *Vance* found the plaintiffs cited to a state regulation that made it a crime to give or sell liquor to minors or intoxicated persons in support of their negligence per se claim, contending the statute set the standard of care. *Id.* at 758. In a footnote, the Court in *Vance* found the defendant mischaracterized the issue of whether the statute extends civil liability and found in the context of the case, the statute either created a cause of action or set a standard of care. *Id.* Plaintiff also cites to *Cuyler v. United States*, 37 F.Supp.2d 1099 (N.D.Ill.1999), in which the Northern District of Illinois found it unnecessary to determine whether the Child Abuse Reporting Act cited by the plaintiff recognized a civil cause of action, because the plaintiff was asserting a claim of negligence not relief under the Child Abuse Reporting Act. *Id.* at 1102. The court

looked to Illinois law to determine whether the complaint, relying on the Child Abuse Reporting Act, stated a negligence claim. *Id.*

A thorough review of the cases cited by Defendant in support of their argument that a private remedy is required simply state that an FTCA claim requires the place in which the alleged misconduct occurred recognizes a cause of action based upon the actions alleged. *See Carlson v. Green*, 446 U.S. 14, 23, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980); *Art Metal–USA, Inc. v. United States*, 753 F.2d 1151, 1159 (D.C.Cir.1985). The Ninth Circuit in *Baker* did not specifically call for a "private right of action" requirement. The court held that whether the plaintiffs had a claim depended upon whether "a private person under like circumstances could be found liable in tort under applicable law." 817 F.2d at 566. Additionally, the court's rejection of the FTCA action brought pursuant to violations of California Government Code and California Civil Code in *Delta Savings Bank*, was based upon the plaintiff's reliance upon "broad statements of public policy." 265 F.3d at 1025. The statutes relied upon provided private causes of action, but not for the actions allegedly committed by the defendant in the case. *Id.* The government provides no other case authority specifically stating the substantive state law relied upon must have a private right of action. This Court's own research found no cases specifically discussing the requirement that substantive law must provide a private remedy.

■ In light of the FTCA cases relying upon state law that do not contain an express private right of action, and the lack of authority specifically requiring the substantive law relied upon contain a private remedy, this Court is persuaded the waiver of immunity within the FTCA does

not require the "law of the place" contain an express private remedy. Plaintiff, however, must demonstrate that California and Quechan would recognize an action against an individual based upon the law it cites and the law must impose a duty upon the defendant to refrain from taking the action alleged here. *See United Scottish Ins. Co. v. U.S.*, 614 F.2d 188, 194 n. 4 (9th Cir. 1979) ("We have already concluded that the existence of a federal duty does not of itself create a duty to be vindicated by the Act.").

### 1. Negligence Per Se

 "To bring suit under the FTCA based on negligence per se, a duty must be identified, and this duty cannot spring from federal law." *Delta Savings Bank v. U.S.*, 265 F.3d at 1026. The duty must arise from state law and "must impose on the defendants a duty to refrain from committing the sort of wrong alleged." *Id.* The Tribe asserts a negligence per se claim against Defendant based upon California Evidence Code § 669, which requires proof of the following elements:

> (a) [t]he failure of a person to exercise due care is presumed if:
>
> (1) He violated a statute, ordinance, or regulation of a public entity;
>
> (2) The violation proximately caused death or injury to person or property;
>
> (3) The death or injury resulted from an occurrence of the nature which the statute, ordinance, or regulation was designed to prevent; and
>
> (4) The person suffering the death or the injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted.

Cal. Evid.Code § 669. In California, an individual may bring an action based upon a statute "embodying a public policy" even if the statute does not contain a specific civil remedy provided the individual is an injured member of the public for whose benefit the statute was enacted. *See Michael R. v. Jeffrey B.*, 158 Cal.App.3d 1059, 205 Cal.Rptr. 312 (1984) (Plaintiff relied upon California Penal Code § 653f in support of his negligence per se claim).

Plaintiff relies upon California Public Resources Code § 5097.9 which prevents interference with Native American religion or damage to places of worship; § 5097.5 which prevents excavation, removal or destruction of historic ruins except with the permission of the public agency with jurisdiction over the land; § 5097.995 renumbered to 5097.993 makes it a misdemeanor to unlawfully excavate, remove, or destroy a Native American historic site listed or eligible for listing in the California Register of Historic Resources; 21083.2 provides the procedure for determining whether a "project" will have a significant effect on unique archaeological resources and the reports and mitigation necessary to prevent the effect; 21084.1 mandates that a project that adversely effects the significance of a historical resource may have significant effect on the environment; and 21081.6 provides the requirements necessary when making findings when an environmental impact report identifies significant effects on the environment or when adopting a mitigated negative declaration. Plaintiff also cites to California Environmental Quality Act ("CEQA") guidelines § 15064.5.

 California Public Resources Code §§ 21083.2, 21084.1 and 21081.6 are applicable to "discretionary projects proposed to be carried out or approved by *public agencies* ..." Cal. Pub. Res.Code § 21080 (emphasis added). Likewise, private action is not generally subject to the CEQA guidelines. As such, the duties contained therein are not applicable to private persons and cannot be relied upon in support of an FTCA claim. *See United States v. Olson*, 126 S.Ct. at 511–12. The remaining

California laws cited by Plaintiff provide duties requiring Defendant from committing the actions alleged in this matter; specifically, for example, the destruction of Native American places of worship and historic ruins. Accordingly, Defendant's request to dismiss Plaintiff's negligence per se claim for failure to allege a substantive state law is DENIED.

## 2. Negligence and Gross Negligence

To prevail in this action, Plaintiff must demonstrate a private person would be liable, in California, under the circumstances alleged here. *See Younger v. United States,* 662 F.2d 580, (9th Cir.1981). In California negligence actions, the plaintiff bears the burden of showing the "defendant owed the plaintiff a legal duty, the defendant breached the duty, and the breach was a proximate or legal cause of injuries suffered by the plaintiff." *Ann M. v. Pacific Plaza Shopping Center,* 6 Cal.4th 666, 673, 25 Cal.Rptr.2d 137, 863 P.2d 207 (1993). Gross negligence is defined as "the want or even scant care or extreme departure from the ordinary standard of conduct." *Eastburn v. Regional Fire Protection Authority,* 31 Cal.4th 1175, 7 Cal.Rptr.3d 552, 80 P.3d 656 (2003) (citing *Franz v. Board of Medical Quality Assurance,* 31 Cal.3d 124, 181 Cal.Rptr. 732, 642 P.2d 792 (1982)).

As such, Plaintiff must demonstrate Defendant owed Plaintiff a duty to refrain from committing the acts alleged in the SAC pursuant to California law. Once the plaintiff demonstrates a duty established by state law, federal law may "provide the standard for reasonable care in exercising the state law duty." *Lutz v. United States,* 685 F.2d 1178, 1184 (9th Cir.1982).

Plaintiff contends it bases the negligence claim upon California law and the complaint cites to federal laws that provide analogous duties and standards of care.

Plaintiff argues federal statutes may establish a standard of care provided the duties imposed by federal law are analogous to those imposed by state law. Defendant argues the SAC improperly blurs the distinction between duty and standard of care. Defendant further argues Plaintiff cannot premise its negligence and gross negligence claims on violations of federal duties under NAGPRA, NEPA, AHPA, ARPA and other federal statutes.

Based upon Ninth Circuit law, the Court agrees Plaintiff must first demonstrate a duty exists under California law before looking to the standards of care established by federal law.

Plaintiff relies upon California Penal Code § 622 ½, which makes it a misdemeanor to injure, deface or destroy an object of archeological or historical value. Plaintiff also relies upon California Public Resources Code § 5097.9, which prevents interference with Native American religion or damage to places of worship; § 5097.91 which establishes a Native American Heritage Commission; § 5097.92 sets out the membership and qualification of the commission; § 5097.93 states the commission shall serve without compensation; § 5097.94 provides the powers and duties of the commission; § 5097.95 explains state and local agencies shall cooperate with the commission; § 5097.96 permits the commission to prepare an inventory of sacred places and directs the commission to prepare a legislative report; § 5097.97 directs the commission to conduct an investigation upon receiving notice that a proposed action by a public agency may cause damage to a sacred site; § 5097.98 sets the commission duties upon receiving notification of a discovery of human remains, including actions a landowner must make when human remains are discovered; § 5097.99 prohibits any person from obtaining or possessing Native American artifacts or human remains which are taken

from a Native American grave; § 21083.2 and 21084.1. Plaintiff also cites to CEQA Guidelines § 15064.5.

Additionally, Plaintiff cites to Restatement Second, Torts § 158 which subjects an individual to liability for trespass for entering on the land in possession of another; § 159 states trespass can be committed on, beneath or above the surface of the earth; § 162 subjects a trespasser to liability for physical harm to the possessor of the land, or the land; § 164 makes one who intentionally enters a land liable for trespass even if he acts under a mistake of fact or law; § 165 subjects one to liability for recklessly or negligently entering land in possession of another; § 168 states a conditional consent to enter land creates a privilege to do so; § 169 states consent to enter part of the land does not create a privilege to enter on any other part; § 173 applies the rules of § 892B to entry or remaining on the land; § 174 applies the rule in § 892B(3) to entry or remaining on land; § 188 states that one who has an easement is privileged to enter the land; § 211 discusses entry on land pursuant to a legislative duty; § 214 subjects a person with privilege to liability for harm caused by unreasonable conduct; § 215 provides the circumstances for terminating privilege to enter upon land; § 870 subjects one to liability for intentionally causing injury to another; § 871 subjects one to liability for depriving another of his legally protected property interest or causing injury to that interest; and § 892B which states consent if effective for all consequences of the conduct and invasion of interests resulting therefrom.

 As discussed above, California Public Resources Code §§ 21083.2 and 21084.1, and CEQA guidelines are not applicable to private persons and therefore cannot be relied upon in support of an FTCA claim. Additionally, California Public Resources Code §§ 5097.91, 5097.92, 5097.93, 5097.94, 5097.95, 5097.96, and 5097.97, which deal primarily with the makeup, powers and duty of the Native American Heritage Commission do not impose duties upon private persons. California Public Resources Code §§ 5097.98 and 5097.99 involve the disposition of Native American human remains. Defendant's actions here do not involve treatment of human remains. As such, these sections do not impose any duties on Defendant. The remaining California law cited [15] imposes duties upon Defendant to refrain from committing the acts alleged here. Plaintiff may rely upon the federal law cited, including NAGPRA, to support a standard of care. Accordingly, Defendant's motion to dismiss the negligence and gross negligence claims and allegations regarding NAGPRA for failing to cite substantive state law and improperly relying upon federal law is DENIED.

### 3. Fiduciary Duty

As part of its negligence and gross negligence claims, Plaintiff alleges the United States breached a fiduciary duty owed to the Tribe. Defendant seeks to dismiss the allegations of breach of fiduciary duty. It argues the Tribe fails to cite California law that allows it to bring a claim for breach of fiduciary duty or creates liability for breach of fiduciary duty when, as here, the United States owns the land in fee. Defendant further argues the Tribe has not cited any federal law that allows it to bring the action for breach of fiduciary duty.[16]

---

**15.** The remaining laws are California Penal Code § 622 ½; California Public Resources Code § 5097.9; Restatement Second, Torts §§ 158, 159, 162, 164, 165, 168, 169, 173, 174, 188, 211, 214, 215, 870, 871, and 892B.

**16.** Defendant cites to cases involving claims brought under the Indian Tucker Act. The Court finds this argument is unclear in the context of an FTCA claim.

Plaintiff argues "a host of federal statutes" establish a fiduciary relationship between the Tribe and the United States government. Quechan further argues California courts recognize certain relationships give rise to fiduciary relationships and California law provides duties for trustees.

■ The Tribe must demonstrate California recognizes actions for breach of a fiduciary duty. *See Marlys Bear Medicine v. United States,* 241 F.3d 1208, 1218—19 (9th Cir.2001). Quechan relies upon the holdings in *Johnston v. Long,* 30 Cal.2d 54, 181 P.2d 645 (1947), and *Galdjie v. Darwish,* 113 Cal.App.4th 1331, 7 Cal. Rptr.3d 178 (2003). In *Johnston,* the California Supreme Court holds an executor is liable for tort committed by him in the administration of the estate and further recognizes that torts committed by employees of a trustee in the course of administration of the estate subject the trustee to personal liability. 20 Cal.2d at 59, 61, 123 P.2d 478. The appeals court in *Galdjie,* recognized the tort claim for breach of trust in its discussion of whether trustee's signatures as individuals on title deed was sufficient to convey good title from the trust. 113 Cal.App.4th at 1349, 7 Cal. Rptr.3d 178. Plaintiff further relies upon California's Probate Code which imposes duties on the trustee to (1) administer trust property solely in the beneficiary's interest, § 16002; (2) not use the trust property for a trustee's own profit or other purpose unconnected with the trust, § 16004; (3) take reasonable steps to preserve trust property, § 16006; and (4) keep beneficiaries informed of the trust's administration, § 16002. The Court finds Plaintiff sufficiently presents California law recognizes liability for breach of a fiduciary duty.

■ Defendant argues no fiduciary relationship exists between the Tribe and United States for land owned by the government in fee not in trust for the Tribe.

The Tribe argues federal statutes establish the United States's "functional obligations" over cultural resources management on tribal lands, and this protection includes federally-owned fee lands within an Indian Reservation. In support, the Tribe cites to the Archeological Resources Protection Act, § 470aa-mm, which discusses archeological resources both on public and Indian lands; the American Antiquities Act, 16 U.S.C. § 433, which protects historic ruins and objects of antiquity on lands owned or controlled by the government; and the Archaeological Historic and Preservation Act, 16 U.S.C. §§ 469—469c–1, which provides for the preservation of historical and archeological data for irreparable lost or destruction caused by alteration of the land resulting from Federal construction project or federally licensed activity; and the National Historic Preservation Act, 16 U.S.C. §§ 470—470x–6, which requires preservation of historic properties controlled or owned by the United States. The Court finds the various federal statutes aimed at protecting Indian cultural resources, located both on Indian land and public land, demonstrate the government's comprehensive responsibility to protect those resources and, thereby establishes a fiduciary relationship. *See Marlys Bear Medicine,* 241 F.3d at 1218 (citing *United States v. Mitchell,* 463 U.S. 206, 224, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983)). The Tribe further argues the creation of the Reservation establish a trust relationship between the United States and Quechan. The Supreme Court has recognized the existence of a trust relationship between the United States and Indian tribes. *See Seminole Nation v. United States,* 316 U.S. 286, 296, 62 S.Ct. 1049, 86 L.Ed. 1480 (1942); *United States v. Mason,* 412 U.S. 391, 398, 93 S.Ct. 2202, 37 L.Ed.2d 22 (1973); *see also Moose v. United States,* 674 F.2d 1277 n. 9 (9th Cir.1982); *Hoopa Valley Indian Tribe v. Ryan,* 415 F.3d 986

(9th Cir.2005); *Bedoni v. Navajo–Hopi Indian Relocation Com'n,* 878 F.2d 1119 (9th Cir.1989). This relationship requires the government's conduct in its dealings with Indian tribes to be judged "by the most exacting fiduciary standards." *Seminole Nation,* 316 U.S. at 297, 62 S.Ct. 1049.

The Tribe demonstrates California recognizes a fiduciary relationship between the federal government and Indians and their land. *See Boisclair v. Superior Court,* 51 Cal.3d 1140, 1149, 276 Cal.Rptr. 62, 801 P.2d 305 (1990). Additionally, California recognizes that special relationships give rise to fiduciary relationships. *See Wolf v. Superior Court,* 107 Cal.App.4th 25, 30 (2003); *Estate of Sanders,* 40 Cal.3d 607, 615, 221 Cal.Rptr. 432, 710 P.2d 232 (1985); *Richelle L. v. Roman Catholic Archbishop,* 106 Cal.App.4th 257, 272 n. 6, 130 Cal.Rptr.2d 601 (2003).

Accordingly, Defendant's motion to dismiss allegations of a fiduciary duty is DENIED.

## II. Discretionary Function

Defendant argues the Tribe seeks damages arising out of Western's discretionary decisions relating to the Gila–Knob pole-replacement project which are expressly exempted from the FTCA waiver of immunity. The government seeks an order striking [17] the allegations in the complaint involving its discretionary decisions. Plaintiff argues its claims are not barred by the discretionary function exception.

The FTCA is subject to the various exceptions including "discretionary function." The "discretionary function" exception precludes

> any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).

The exception pertains to "acts that involve an element of judgment or choice." *United States v. Gaubert,* 499 U.S. 315, 322, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991). The court looks to "the nature of the conduct, rather than the status of the actor" in ascertaining whether the exception applies. *Id.* Application of the discretionary function exception requires a two-step analysis. First, the Court must determine whether the "challenged actions involve an element of judgment or choice." *Soldano v. United States,* 453 F.3d 1140, 1145 (9th Cir.2006). If so, the Court must determine whether the judgment or decision is "grounded in social, economic, and political policy." *Id.* The government has the burden to demonstrate applicability of the discretionary function. *Whisnant v. United States,* 400 F.3d 1177, 1181 (9th Cir.2005).

Defendant maintains the following actions, which paraphrases allegations in the SAC, fall within the discretionary function exception:

(A) Western's decision to undertake the pole replacement project.

(B) Western's decision, pursuant to NEPA, to prepare a "categorical exclusion" rather than an environmental assessment or Environmental Impact Statement.

---

**17.** Plaintiff argues the United States improperly seeks to strike portions of the Amended Complaint without filing a motion to strike. The Court finds the United States seeks to strike portions of the complaint based upon its argument it is entitled to judgment with regard to specific allegations and claims in the complaint. Accordingly, Defendant's motion is not an improper motion to strike.

(C) Western's decision to use tracked vehicles in the pole-replacement project.

(D) Western's alleged failure to sufficiently disclose, prior to the commencement of the project, all relevant information to a tribe whose Cultural Resources may be affected by activities.

(E) Western's alleged failure to disclose the harm to the Tribe and failure to disclose the full extent of Western's alleged damage to the Cultural Resources.

(F) Western's alleged failure to supervise its employees.

It maintains these allegations cannot support the FTCA claim and should be stricken from the complaint. The Tribe argues it does not base its claim on five of the six actions listed above. The question of how the government was negligent is critical to the determination of whether the discretionary function exception applies. *Id.* Although Plaintiff maintains five of the six allegations are merely background facts, they appear to be the bases of Plaintiff's claim the government committed negligence. As such, the Court will address all allegations challenged by Defendant.

## A. Western's Decision to Undertake the Pole–Replacement Project

█ Plaintiff alleges Defendant breached its duty by "conducting extensive and harmful land-disturbing pole replacement and blading activities within or near the Tribe's known Cultural Resources without...necessity for the project." SAC ¶ 120(1). Defendant demonstrates Western is vested with the power to construct, operate and maintain power transmission lines. *See* 42 U.S.C. § 7152; Department of Energy ("DOE") press release, December 21, 1977, Farhat Decl., Exh. 2. Upon conducting a feasibility study of the poles on the Gila–Knob transmission line, West-

ern determined it needed to replace certain wood poles. *See* Farhat Decl., Documents regarding pole replacement, Exh. 6; Photos of poles, Exh. 7; and Gila–Knob 161 KV Transmission Line Structure List, Exh. 8. As such, the decision to engage in the pole replacement project involved an "element of judgment or choice." Furthermore, the decision to replace the poles was based upon Western's interest in protecting its employees and ensuring the reliability of the transmission line, which is grounded in the interest of public policy. Accordingly, the decision to undertake the pole-replacement project is subject to the discretionary function exception and Plaintiff cannot base its claims upon this decision.[18] Defendant's motion to dismiss this allegation is GRANTED.

## B. Western's Decision, Pursuant to NEPA, to Prepare a "Categorical Exclusion"

Plaintiff alleges Defendant breached its duty by conducting the harmful pole-replacement activities "without sufficient environmental impact analysis..." SAC at 34. The Tribe contends Western decided to issue a non-public "categorical exclusion" rather than a public environmental analysis. The Tribe, however, maintains the tort claims are not based upon this decision.

█ The government demonstrates that its decision to prepare the "categorial exclusion" pursuant to the National Environmental Policy Act ("NEPA") is a discretionary decision. *See Nevada v. United States,* 221 F.Supp.2d 1241 (D.Nev.2002) (Determining NEPA applies only to discretionary agency actions) (citing *Sierra Club v. Babbitt,* 65 F.3d 1502, 1512 (9th Cir.1995) (Determining the procedural requirements of NEPA are triggered by a

---

**18.** Rather than striking the allegations protected by the discretionary function exception from the complaint, the Court finds it more

appropriate to preclude Plaintiff from basing its claims upon those facts.

discretionary federal action.)). The decision to complete a "categorical exclusion" is clearly grounded in public policy considerations. Accordingly, to the extent the decision to prepare a "categorical exclusion" rather than an environment analysis or impact statement is the basis for Plaintiff's tort claims, the tort claims must be dismissed.

## C. Western's Decision to Use Tracked Vehicles in the Pole–Replacement Project

■ In the background facts portion of the SAC dealing with the pole-replacement project, Plaintiff discusses Western's decision and use of tracked vehicles during the pole-replacement project. *See* SAC at 14–15, ¶¶ 48—52. Additionally, Plaintiff alleges Western breached its duties by "using tracked vehicles in a destructive manner on or near known Cultural Resources." SAC at 34, ¶ 120. Defendant contends these allegations fall within the discretionary function exception to the FTCA, but set forth no argument in support. Because it is the government's burden to demonstrate the applicability of the exception and it fails to do so, its request to strike or dismiss claims based upon the decision to use tracked vehicles is DENIED.

## D. Western's Failure to Sufficiently Disclose Relevant Information to the Tribe Prior to Commencement of the Project

■ Plaintiff alleges Defendant breached its duty to consult with and disclose information to the Tribe by engaging in the pole-replacement project without "disclosure to the Tribe." SAC at 34, ¶¶ 119(1), 120. The government states its failure to disclose potential effects prior to commencement of the project falls within the discretionary function exception to the FTCA. However, Defendant points out it is *obligated* to comply with 36 C.F.R. Part 800, which requires consultation with affected tribes. Defendant argues it complied with the requirements and contends Plaintiff seeks to impose additional duties, but fails to state what extra duties the Tribe seeks to impose beyond consultation and disclosure. The government, however fails to discuss how it has complied its requirement to discuss issues with the tribe.

The government fails to demonstrate that the duty to disclose involved an element of judgment or choice. As such, the government fails to meet its burden that its alleged failure to disclose relevant information prior to commencement of the pole-replacement project falls within the discretionary exception and the request to dismiss this allegation is DENIED.

## E. Western's Alleged Failure to Disclose the Harm to the Tribe

■ Plaintiff alleges Defendant breached its duty to refrain from "continuing with a project despite knowledge of having damaged Cultural Resources...without notifying governmental entities" and "to immediately cease work and report to a tribe when federal activities damage Cultural Resources..." when it failed to "stop work and notify the Tribe upon Western's initial destruction of Cultural Resources..." SAC at 30, ¶ 117, 34, ¶¶ 199(1), 120. Although the government maintains its alleged failure to disclose harm to the Tribe falls within the discretionary function exception, it fails to demonstrate the exception applies. Accordingly, it fails to meet its burden and the request to dismiss the allegation is DENIED.

## F. Western's Alleged Failure to Manage its Employees

■ Plaintiff alleges Defendant failed to "properly manage [its] employees and agents... thereby allow[ed]" the destruction of Cultural Resources to occur. SAC

at 34, ¶ 120. Defendant argues its training and supervision are protected from liability by the discretionary function exception. The Tribe argues its claims are not based upon Western's failure to supervise its employees but its decision to forgo an archaeological monitor during the project and to delegate cultural resource protection to an unqualified individual.[19]

As demonstrated by Defendant, many courts have found decisions relating to hiring, supervising and training employees fall within the discretionary function exception. *See Vickers v. United States*, 228 F.3d 944 (9th Cir.2000) (INS's decision to excuse employee from a handgun qualification course involved a judgment subject to the discretionary function exception); *Nurse v. United States*, 226 F.3d 996, 1001–02 (9th Cir.2000) (Allegations of negligent and reckless employment, supervision and training fall within the discretionary function exception); *Gager v. United States*, 149 F.3d 918, 920—22 (9th Cir. 1998) (Postal Service's decision not to train and supervise subject to the discretionary function exception); *Burkhart v. Washington Metropolitan Area Transit Authority*, 112 F.3d 1207, 1215 (D.C.Cir.1997) (Decisions regarding hiring, training and supervision are discretionary); *Tonelli v. United States*, 60 F.3d 492, 496 (8th Cir.1995)

(Allegations of negligent hiring shielded from tort liability by the discretionary exception). There is no evidence of any rule or regulation regarding the supervision of Western's employees. *See Berkovitz v. United States*, 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988) ("[T]he discretionary function exception will not apply when a federal statute, regulation or policy specifically prescribes a course of action for an employee to follow."). Additionally, decisions on hiring, supervising and training the employees would involve public policy considerations, such as staffing and funding. Accordingly, any claim based upon Western's failure to properly manage or supervise their employees is barred by the discretionary function exception. Defendant's request to dismiss this allegation is GRANTED.

### III. Defendant's Request to Dismiss the Nuisance Claims and Gross Negligence Claims

Defendant withdraws these requests until the close of phase three expert discovery. As such, the Court will not address them.

### IV. Dismissal of Six Cultural Resource Sites [20]

The government seeks dismissal of the following six cultural resource sites: No. 4–IMP–7144, No. 4–IMP–7148, No. 4–

---

19. Because Defendant does not seek dismissal of claims based upon Western's alleged decision to forgo an archaeological monitor during the project and to delegate cultural resource protection to an unqualified individual, the Court will not address these allegations.

20. The California Archeological Inventory guidelines define sites as "a location of associated artifacts and features, regardless of temporal placement or complexity" and must meet two criteria (1) consist of at least three associated artifacts or a single feature and (1) be 45 years or older as determined by evidence. Tribe's Exh. 25 at 36–37. The Arizona State Museum guidelines defines sites "as a cultural resource that contains physical

remains of past human activity that are at least 50 years old" and should include one of the following: (1) 30 or more artifacts of a single class in a 15 m diameter area; (2) 20 or more artifacts of two classes in a 15 m diameter area; (3) one or more archaeological features in temporal association with any number of artifacts; or (4) two or more temporally associated archeological features without artifacts. *Id.* at 37. Sites include "lithic procurement and reduction areas, ceremonial areas such as geoglyphs or petroglyphs, temporary camps which usually include cleared circles, foot paths or trails, sherd scatters, historic and multicomponent, which includes both historic and prehistoric remains." *Id.*

IMP–7149, No. 4–IMP–7151, No. 4–IMP–7152 and No. 4–IMP–7153. It maintains 5 of these cultural resource sites identified in the SAC are ineligible for listing on the National Register. Defendant further maintains two sites allegedly impacted by Western were mis-identified by Jay von Werlhof, an archeologist hired by the Tribe. Defendant argues it has no duty to protect sites that are ineligible for listing on the National Register of Historic Places. Specifically, Defendant maintains 7148 was misidentified and should be dismissed. The government seeks dismissal of 7149, because it was misidentified and it is ineligible for listing on the National Register. Defendant is seeking dismissal of the remaining sites listed, because they are ineligible for listing on the National Register.

Plaintiff argues five of the six sites discussed should not be dismissed. Plaintiff agrees site 7149 was misidentified, but contends it is not part of its damages claim. With regard to the remaining five sites Defendant seeks to dismiss, the Tribe argues federal law, California law and Western policies establish Defendant's duty not to destroy on-reservation cultural sites that are deemed ineligible for listing on the National Register.

**A. Site 7149**

Because the Tribe agrees site 7149 was misidentified, is not part of their damages claim and the Tribe does not assert any argument in opposition to Defendant's request to dismiss any claims based upon damages to site 7149, the Court GRANTS Defendant's motion to dismiss site 7149.

**B. No Duty to Protect Ineligible Sites**

Defendant maintains there is no duty to protect sites ineligible for listing on the National Register and therefore, Sites 7144, 7151, 7152, and 7153 should be dismissed. The government argues, to the extent the Tribe contends the Archeological Resources Protection Act ("ARPA") imposes a duty, the Tribe is in error.

Plaintiff argues California law establishes a duty to protect cultural resources whether or not they are eligible for listing on the National Register. The Tribe cites to California Public Resource Code § 5097.9 which states "no private party using or occupying public property [shall]...cause severe or irreparable damage to any Native American place or worship, religious or ceremonial site or sacred shrine located on public property..." Additionally, California law requires "every person...to abstain from injuring the person or property of another or infringing upon any of his or her rights." Cal. Civil Code § 1708. California Public Resource Code § 5097.5 prohibits a person from destroying or injuring historic ruins or archeological sites situated on public lands. California Public Resource Code § 5097.995 renumbered to 5097.993 makes it a misdemeanor to unlawfully excavate, remove, or destroy a Native American historic site listed or eligible for listing in the California Register of Historic Resources.[21] The Tribe further asserts these

---

Isolates are cultural resources containing less than sites and are defined as "features with no other features within 100 m (325 ft) diameter." *Id.* Examples of isolates include a mine shaft, prospect pit, rock pile or unidentified depression. *Id.*

21. Plaintiff also relies upon California Public Resources Code §§ 21081, 21083.2(g)(3), 21084.1, 21167.6.5 and 21168.9 which are applicable to projects by public agencies and therefore cannot be relied upon in a FTCA

claim. Likewise, California Public Resources Code § 5097.94(b), (g), (i) provides the duties of the California Native American Heritage Commission and are not applicable to private parties. Plaintiff also cites to California Native American Heritage Commission Guidelines for Monitors/Consultants Native American Cultural, Religious, and Burial Sites. However, the Court finds these are recommendations for monitors/consultants, if one is

duties are analogous to those established by federal law. Plaintiff cites to ARPA which has a stated purpose of protecting archeological resources and sites on public and Indian lands. According to the Tribe, ARPA is not limited to sites eligible for listing on the National Register.

 In reply, the government argues the Tribe's archeologist testimony is contrary to the position taken by the Tribe. Defendant relies upon Dr. Cleland's deposition testimony regarding eligibility for inclusion in the National Register. The Court finds this testimony irrelevant to the Tribe's argument that California law imposes a duty to protect cultural property regardless of whether it is eligible for inclusion in the National Register. Furthermore, the government fails to address this argument at all.[22] Accordingly, the Court finds Plaintiff demonstrates that California law imposes a duty upon Defendant to protect the sites not eligible for inclusion in the National Register. Defendant's motion to dismiss Sites 7144, 7151, 7152, and 7153 from the action is DENIED. Plaintiff's motion for an order finding Western had a duty not to destroy cultural resources deemed important to the Tribe but ineligible for listing on the National Register is GRANTED.

## C. Site 7148

Defendant seeks dismissal of site 7148, because it was misidentified as impacted by Mr. von Werlhof and the Tribe fails to state a claim regarding this site. Western further requests that the Court prohibit the Tribe from relying on Mr. von Werlhof's report for site 7147, because it was misidentified. The Tribe argues the URS report identifies impacts to sites 7147 and 7148. The Tribe admits von Werlhof's report may not have identified the sites accurately, but maintains his report documents serious damage. Quechan maintains Mr. von Werlhof will be able to correct any errors in identification during his testimony at trial. Defendant maintains it took Mr. von Werlhof's deposition and he is prevented from changing his testimony.

Although Defendant argues Mr. von Werlhof cannot change his testimony at trial, it provides no information on how his testimony explaining the misidentification of cultural sites will result in a change in his testimony. Without some argument that an explanation would be improper or undue prejudice may result despite the government's notice of the misidentification, the Court tentatively finds no support for Defendant's request that Plaintiff be prevented from relying on the report or for preventing Mr. von Werlhof from testifying at trial. At this time, this matter is best left for motions-in-limine or at trial.

 In support of Plaintiff's allegation that 7148 was impacted by Western, Plaintiff relies in part upon the language contained in the URS report. Upon review of the report, the Court finds site 7148 was impacted with "linear scars" within the Western right-of-way "that appear to be older disturbance." URS Report, Tribe's Exh. 52 at 638. Additionally, the report states "there is no evidence that archeological features were affected by the pole replacement project..." *Id.* As such, the URS Report does not support Plaintiff's

---

present at a project and do not establish duties.

**22.** Defendant discusses and provides evidence of its attempt to consult with California's Office of Historic Preservation. *See* Exh. 13, Farhat Decl. However, there are no facts

demonstrating whether the sites listed above are eligible for inclusion on the California Register of Historic Resources.. As such, there is a genuine dispute as to whether California Public Resources Code Section 5097.993 imposes a duty on Defendant to protect the listed sites.

allegation. However, the report by Mr. von Werlhof provides a genuine dispute as to whether site 7148 was impacted by Western's pole replacement project. Accordingly, Defendant's motion as to site 7148 is DENIED.

## V. Claim for Declaratory and Injunctive Relief

Defendant argues the claims for declaratory and injunctive relief should be dismissed from this FTCA claim, because the only relief available in a FTCA claim is money damages. Quechan agrees that injunctive relief is inappropriate in a FTCA claim. Plaintiff, however, argues the claim for declaratory relief under 28 U.S.C. §§ 2201 and 2202 is proper.

The United States waives immunity in FTCA cases for claims against the United States seeking monetary damages. *See* 28 U.S.C. § 1346. Plaintiff fails to demonstrate a similar waiver of immunity for declaratory relief in FTCA cases. *See Lumarse, Inc. v. Dept. of Health and Human Svcs.,* 191 F.3d 460, 1999 WL 644355 (9th Cir.1999); *Westbay Steel, Inc. v. United States,* 970 F.2d 648, 651 (9th Cir.1992) ("[T]he only relief provided for in the FTCA is money damages."). Accordingly, Defendant's motion is GRANTED as to the claims for declaratory relief and injunctive relief.

## VI. *Parens Patriae*

Defendant argues Plaintiff cannot bring this action in the capacity of *parens patriae,* because it is analogous to a class action which is prohibited under the FTCA, and the Tribe, like a state, cannot state a claim in the capacity of *parens patriae* against the United States. Western asks the Court to dismiss the Tribe in its *parens patriae* capacity and strike all allegations and claims in the SAC concerning alleged injuries to individual tribal members. Quechan argues it may sue in a *parens patriae* capacity and it is not disguising a class action. The Tribe further argues the portions of the complaint the United States seeks to strike are relevant to the Tribe's case whether or not it sues in *parens patriae* capacity.

A sovereign may bring a suit on behalf of its citizens as *parens patriae* if it "articulate[s] an interest apart from the interests of particular private parties", "expresse[s] a quasi-sovereign interest" and alleges "injury to a sufficiently substantial segment of its population." *Alfred L. Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592, 607, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982). Defendant does not attack the *parens patriae* action for failing to meet these requirement, but instead argues the Tribe is seeking an improper class action in an FTCA action. The Tribe maintains it is not disguising a class action, as the individual tribal members do not seek damages separate from the Tribe's monetary claim and the voluntary dismissal of its emotional distress claim is further evidence that it does not intend to seek a class action. In reply, the government argues the Tribe's reservation of its right to introduce evidence of injuries caused individual tribal members through expert reports and at trial is a "back door" means to introduce evidence of emotional distress. However, Quechan demonstrates that the impact on individual tribal members is relevant to the claims pending in the action.[23] The Court finds Plaintiff is not attempting to assert a class action through the use of *parens patriae* capacity.

The government further argues a tribe, like a state, is prohibited from bring-

---

23. The United States argues, for example, the Tribe fails to demonstrate how a member of the Tribe has lost use or enjoyment of the cultural resource sites damaged by Western in support of the nuisance claim.

ing an action in *parens patriae* capacity against the United States. Neither party presents cases in which a Tribe was allowed or prevented from pursuing an FTCA claim as *parens patriae* on behalf of its tribal members. The Court's own research found no cases. The government relies upon the holding in *Com. of Massachusetts v. Mellon*, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923), in support of its argument that the Tribe may not assert a *parens patriae* claim against the United States. The Court in *Mellon* determined a state cannot, as parens patriae, "institute judicial proceedings to protect citizens of the United States from the operation of the statutes thereof." *Id.* at 485, 43 S.Ct. 597. It is the duty of the United States, not the duty of a state, to enforce the rights of citizens of the United States with respect to their relations with the federal government. *Id.* at 485—86, 43 S.Ct. 597. However, Plaintiff demonstrates some courts recognize exceptions to the *Mellon* holding, *American Rivers v. F.E.R.C.*, 201 F.3d 1186, 1205 (9th Cir.2000); *Kansas v. United States*, 748 F.Supp. 797, 802 (D.Kan.1990); *Abrams v. Heckler*, 582 F.Supp. 1155 (S.D.N.Y.1984), and have permitted Indian tribes to sue as *parens patriae* without comment. *Sisseton–Wahpeton Sioux Tribe of Lake Traverse Indian Reservation, North Dakota and South Dakota v. United States*, 90 F.3d 351 (9th Cir.1996); *See also Kickapoo Tribe of Oklahoma v. Lujan*, 728 F.Supp. 791 (D.D.C.1990) (Holding a tribe must be acting on behalf of all its members to have standing to sue under doctrine of *parens patriae*). Accordingly, the Court finds Defendant fails to meet its burden as to its request to dismiss the claims brought pursuant to *parens patriae* capacity. The motion to dismiss the claims and to strike portions of the complaint supporting the *parens patriae* claims is DENIED.

**VII. The United States as the Only Defendant**

Western argues the FTCA provides that the United States is the sole party which may be sued for damages arising out of the negligence of its employees. Plaintiff does not dispute this argument, but states the Attorney General must certify the federal employees were acting within the scope of their employment when the actions giving rise to the claim occurred. It maintains it is unaware of whether the requisite certification was issued.

■■■ On December 5, 2005, the government submitted a Notice of Substitution and Certification of United States Attorney Debra Wong Yang that the individual named defendants were acting within the course and scope of their employment at all times relevant to the alleged incident. *See* Doc. No. 146. Pursuant to 28 U.S.C. § 2679(d)(1), the Court ordered the substitution of the parties and the caption was corrected. *Id.; see also* Doc. No. 163. Accordingly, Defendant's request to substitute the parties is DENIED as moot.

**VIII. Negligence**

Plaintiff argues Defendant negligently destroyed the Tribe's cultural resources and lands. Quechan moves for summary judgment as to sites 7140, 7147, 7138, 7141, 7143 and 689. Under California law, the plaintiff bears the burden of showing the "defendant owed the plaintiff a legal duty, the defendant breached the duty, and the breach was a proximate or legal cause of injuries suffered by the plaintiff" in negligence actions. *Ann M.*, 6 Cal.4th at 673, 25 Cal.Rptr.2d 137, 863 P.2d 207 (1993).

**A. Duty**

As discussed above, California law imposes duties on Defendant to refrain from causing severe damage to any Native American religious or ceremonial site or

sacred shrine located on public property, from destroying an object of archeological or historical value, to protect cultural resources both on Indian and public land and to take reasonable steps to protect trust property.

 Without authority, Plaintiff contends Western's duties further arise from promises Western made to the Tribe to avoid eligible properties and eligible sites, and cause no additional impacts. The government fails to respond to this argument. The Court's own research found that California courts recognize a duty may arise from a promise, if the defendant has reason to believe the plaintiff will rely on the promise to his detriment. *See Aim Insurance Co. v. Culcasi*, 229 Cal.App.3d 209, 215, 280 Cal.Rptr. 766 (1991); *Bloomberg v. Interinsurance Exchange*, 162 Cal. App.3d 571, 575–576 (1984) (Auto club's undertaking to send a tow truck, upon which victim relied, resulted in a duty to act with care.); *See also Valdez v. Taylor Auto. Co.*, 129 Cal.App.2d 810, 278 P.2d 91 (1954) ("It is well established that a person may become liable in tort for negligently failing to perform a voluntarily assumed undertaking even in the absence of a contract to do so."). It was reasonable for Western to believe Quechan would rely on its repeated promises to avoid eligible sites and cause no additional impacts. Accordingly, the Court finds duties arise from Western's promises.

Plaintiff further maintains duties arise from two Quechan laws and federal laws, regulations and manuals. However, the Court previously found duties do not arise from Quechan law and Plaintiff may rely on federal law for establishing a standard of care only.

**B. Breach**

 Plaintiff argues Western breached its duties by (1) scarring on-Reservation cultural resources with heavy equipment, despite knowing of the existence of and risk to the resources; (2) violating Western's own categorial exclusion that an on-site archeologist monitor on-Reservation work near and within eligible cultural sites; (3) only flagging two cultural features and no sites; (4) permanently scarring tribal cultural and other property outside of Western's right-of-way; (5) delegating cultural resource protection to an unqualified employee; (6) allowing the unqualified employee to materially modify EWRs originally drafted by archaeologists to the detriment of cultural resources (7) failing to follow even the modified EWRs; (8) not obtaining the Tribe's permission to damage the resources; and (9) failing to stop work and inform the Tribe upon first impacting on-Reservation cultural resources, and instead continuing to work and impact more cultural resources.

The government admits that Western impacted sites 7140, 7147, 7138 and 689, but disputes the scope of the impact. Defendant also disputes that it is liable for the impacts. The government further argues there are genuine issues of material facts as to the Tribe's claims. Western maintains it did not ignore archeological monitoring requirements and knowingly expose the cultural resources to risk. Defendant further maintains the facts show it acted in good faith in conducting inventory of the resources and developing a plan to protect the sites.

The facts before the Court demonstrate Western contracted with Western Cultural Resource Management, Inc. ("WCRM") to conduct a cultural resource inventory on lands along the Pilot Knob transmission line. Tribe's Exh. 22, Letter dated July 14, 1994 from Gary M. Brown, Project Manager, WCRM to Fritz Brown, Quechan Tribal President. WCRM completed the written report dated April 19, 1995. *See* Tribe's Exh. 25. Twenty-six sites and seven isolated finds were reported. *Id.* at

138. Of the twenty-six sites, ten were recommended as eligible for the National Register of Historic Places. *Id.*[24] WCRM made management recommendations for avoiding harm to cultural resources. *Id.* at 284—288.

Western assured Quechan the pole replacement project would have no effect on historic properties. *See* Letter dated May 31, 1995 from Richard M. Duarte, Environmental Manager to Fritz Brown, Tribes' Exh. 27 at 296. 298; Letter dated September 3, 1998 from Roy Watson, Realty Officer to Mike Jackson, Sr., Quechan Tribal President, Tribe's Exh. 36. Western stated access for the project will be restricted to existing access roads and rubber-tired vehicles will be used. Tribe's Exh. 27 at 296. Western further stated it would ensure all construction and maintenance activities to avoid eligible properties and personnel will be briefed on avoidance areas. *Id.* at 298. Western further assured Quechan it will contact the Tribe in the event additional impacts become necessary. *Id.* Later, Western informed the Tribe it must use a tracked vehicle during the pole replacement project and stated there will be no effect on historic properties from using the vehicles. Letter dated August 3, 1998 from Kenneth Liliff acting for Western's Regional Manager, to Fritz Brown, Tribe's Exh. 35. John R. Holt, NEPA compliance Officer, executed a categorical exclusion on October 5, 1998, which stated "monitoring will be accomplished by an Archeologist for those structures near or within eligible cultural sites." Tribe's Exh. 39.

On November 4, 1998, lithic scatter and two sleeping circles were damaged during the pole-replacement project at site 7140. Lessons Learned Report, Tribe's Exh. 46 at 558. Western discovered the damage on February 22, 1999 and notified the tribe

on March 2, 1999. *Id.* A review of the incident determined the destruction was caused by construction equipment driving over the resources during the pole replacement project which would have been avoided had an archeological monitor been present. *Id.*

Thereafter, the Tribe requested Western conduct a study to determine whether other sites were damaged. URS Report, Tribe's Exh. 52 at 633. Western retained URS to conduct a field evaluation of the 10 sites eligible for inclusion in the National Register. *Id.* The URS report confirms significant impact to site 7140 and small impacts to 7147, 7138, and 689. *Id.* at 635a, 638, 641a. The report notes some impacts were caused by non-Western activities, including all-terrain vehicles, automobiles and pick-up trucks. *Id.* at 635. The impact to site 7147 was caused by Western activities and non-Western activities. *Id.* at 635a. It reported no evidence that the archeological features of site 7147 were affected by the project. *Id.* The impact to site 7140, caused by Western's vehicles, included deep tracks over cleared circles and areas outside Western's right-of-way. *Id.* at 638. Western's activities impacted a 20 meters by 20 meters area within the right-of-way at site 7138. *Id.* There is a dispute as to whether Western impacted what is labeled a "problematic" area further south. *Id.* The report further sites impact by other non-Western vehicles and finds no evidence that the archeological features were affected by the pole-replacement. *Id.* The report notes in one paragraph that there is no evidence that archaeological features were affected by pole replacement and few artifacts were observed within the footprint of the activity area in site 689 and in the next para-

---

**24.** Sites found to be eligible: 7146, 7147, 7148, 7140, 7139, 7138, 7142, 7141, 7143, and 698. *See* Tribe's Exh. 25.

graph notes no archeological features were recorded in site 689 and few artifacts were observed. *Id.* at 639a. The report then notes small impacts outside the right-of-way near structures 18–2 and 18–3 within site 689. *Id.* at 641a.

■ The Court finds there is no dispute as to whether Western impacted cultural site numbers 7140, 7147, 7138 and 689. Accordingly, Defendant breached its duties as to those sites. There is a genuine dispute as to whether sites 7141 and 7143 were impacted by Western's activities.

## C. Cause

■ Whether proximate cause exists as a result of defendant's breach of a duty are questions of fact generally resolved by a trier of fact. *Armstrong v. United States,* 756 F.2d 1407, 1409 (9th Cir.1985); *Banville v. Schmidt,* 37 Cal.App.3d 92, 112 Cal.Rptr. 126 (1974). However, where the facts are undisputed, and only one conclusion may be reasonably drawn from the facts, the question of causation is one of law. *Lutz v. United States,* 685 F.2d 1178, 1185 (9th Cir.1982) *Banville,* 37 Cal.App.3d at 106, 112 Cal.Rptr. 126. Defendant does not specifically address the issue of proximate cause. Instead the government argues the facts material to the Tribe's claims are in dispute and refers the Court to its opposition to Plaintiff's statement of undisputed facts. The government disputes nearly every fact presented by Plaintiff. However, the majority of the "disputes" presented by the government are that the Tribe only cites to a portion of the evidence submitted in support and directs the Court to the entire document. The Court thoroughly reviewed the evidence presented by both parties without relying solely upon either parties' undisputed facts.

Based upon the undisputed facts this Court discusses above, the Court finds the only conclusion to be drawn is Western's pole-replacement activities of driving through and otherwise impacting the eligible sites with its heavy equipment proximately caused damage to Plaintiff's cultural resources. The fact that other non-Western activity also impacted the sites is an issue relating to the scope of the damage which is not currently before the Court.

Accordingly, the undisputed facts demonstrate Plaintiff is entitled to judgment on the claim of negligence as to sites 7140, 7147, 7138 and 689. Plaintiff fails to carry its burden as to sites 7141 and 7143.

## IX. Gross Negligence

The Tribe argues Western's "incredibly indifferent attitude" is undisputed fact and entitles the Tribe to summary judgment on the gross negligence claim. Defendant argues Quechan has no evidence of wanton and indifferent conduct by Western.

Gross negligence is defined as "the want or even scant care or extreme departure from the ordinary standard of conduct." *Eastburn,* 31 Cal.4th 1175, 7 Cal.Rptr.3d 552, 80 P.3d 656 (citing *Franz v. Board of Medical Quality Assurance,* 31 Cal.3d 124, 181 Cal.Rptr. 732, 642 P.2d 792 (1982)).

Plaintiff argues Defendant had full knowledge the location of cultural resources, their importance to the Tribe and the risks the project posed to the resources. Quechan further maintains Western admits it excused the archeological monitor, made no attempt to avoid the cultural resources, failed to seek consultation and failed to report damage after it occurred. The government argues the evidence demonstrates Western did not act with the complete failure to exercise care. Defendant maintains it retained WCRM to identify and evaluate cultural resources, made attempts to consult with the Tribe, prepared work recommendations to pro-

tect cultural resource sites, and flagged sites.

 In light of the evidence demonstrating Western attempted to identify sites, developed work recommendations to avoid sites and consulted with the Tribe, the Court finds there is a genuine issue of material fact as to whether the defendant acted with "scant care." Accordingly, Quechan's motion for summary judgment as to the gross negligence claim is DENIED.

## X. Negligence Per Se

Quechan argues it is entitled to summary judgement on it negligence per se claim. Under California law,

(a) [t]he failure of a person to exercise due care is presumed if:

(1) He violated a statute, ordinance, or regulation of a public entity;

(2) The violation proximately caused death or injury to person or property;

(3) The death or injury resulted from an occurrence of the nature which the statute, ordinance, or regulation was designed to prevent; and

(4) The person suffering the death or the injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted.

Cal. Evid.Code § 669. Plaintiffs maintain the four elements are met with respect to California Public Resources Code §§ 5097.9, 5097.5, 5097.995, 21083.2, 21084.1 and California Penal Code 622 ½.[25] As discussed above Plaintiff cannot rely upon violations of §§ 21083.2 and 21084.1 or Quechan laws in support of their claims.

### A. California Public Resources Code § 5097.9

 Section 5097.9 prohibits "severe or irreparable damage to any Native American sanctified cemetery, place or worship, religious or ceremonial site, or sacred shrine located on public property..." Plaintiff argues Defendant severely and irreparably damaged Quechan ceremonial sites located on private property, thereby violating section 5097.9, Western's actions proximately caused damage to the Tribe's property, the damage resulted from an occurrence of the nature from which the section 5097.9 was designed to protect, and Plaintiff is within the class of persons section 5097.9 is designed to protect.

Defendant sets forth no argument on the merits of the claim beyond its previous argument that the Tribe relies upon state law claims that are not actionable against private individuals. This Court, however, found California allows negligence per se claims based upon California law that does not provide for a specific civil remedy provided the individual is an injured member of the public for whose benefit the statute was enacted. Section 5097.9 clearly seeks to protect the interest of Indian tribes.

 The undisputed facts demonstrate site 7140 was severely damaged by Western's activities. *See* URS Report, Tribe's Exh. 52 at 632a, 638. Western's activities proximately caused the damage to site 7140 and the nature of Western's activities, namely the careless, destructive activity near known cultural sites is the type for which the statute was designed to prevent. Furthermore, there is no evidence that the

---

**25.** Plaintiff cites California Penal Code § 6221.1 in its motion for summary judgment, however the Court was unable to locate this citation. Because the Plaintiff previously referred to California Penal Code § 622 ½ in its opposition to Defendant's motion for summary judgment and argues section 6221.2 prohibits persons from defacing "any object or thing of archaeological or historical interest or value..." and this is the exact language contained in section 622 ½, the Court construes Plaintiff's argument as referring to section 622 ½. *See* Tribe's Memo at 18.

public interest and necessity required the damage. Accordingly, Plaintiff is entitled to judgment as to the negligence per se claim for site 7140. The Court finds Plaintiff fails to provide sufficient evidence that the remaining sites for which it seeks judgment were "severely or irreparably" harmed by Western's activities. *See* Tribe's Exh. 52 at 632a, 635a—641a.

## B. California Public Resources Code § 5097.5

Section 5097.5 prevents the willful excavation, removal, destruction, injury or defacement of "any historic or prehistoric ruins, burial grounds archeological or vertebrae paleontological site...on public lands..."

■■■ The undisputed evidence demonstrates Western knowingly destroyed, injured and defaced archeological sites. *See* WCRM Report, Tribe's Exh. 25 at 138, 284—88; Tribe's Exh. 27; URS Report, Tribe's Exh. 52; Lessons Learned Report, Tribe's Exh. 46. As such, Western violated section 5097.5 and its actions in driving over the sites proximately caused the damage to the cultural sites. Furthermore, the Court finds the nature of Defendant's activities in injuring the cultural resources is the type for which the statute was designed to prevent and an Indian tribe with archeological sites is a class of person for whom the statute was designed to protect. Accordingly, the Tribe's motion for summary judgment on the negligence per se claim for sites 7140, 7147, 7138 and 689 based upon section 5097.5 is GRANTED.

## C. California Public Resources Code § 5097.995

Section 5097.995, renumbered as section 5097.993 makes it a misdemeanor to unlawfully and maliciously remove, destroy, injure or deface a Native American historic cultural or sacred sites, listed or eligible for listing on the California Register of Historic Resources, "if the act was committed with specific intent to vandalize, deface, destroy, steal, convert, possess, collect or sell a Native American...artifact..."

■■■ The Court finds Plaintiff fails to demonstrate a lack of genuine issue of material fact as to whether the destruction of the sites was "committed with specific intent to vandalize, deface, destroy, steal, convert, possess, collect or sell a Native American artifact." As such, Plaintiff fails to demonstrate Defendant violated section 5097.995 and are not entitled to judgment. Therefore, the motion is DENIED as to the negligence per se claim based upon a violation of section 5097.995.

## D. California Penal Code § 622 ½

Section 622 ½ makes it a misdemeanor to wilfully injure, disfigure, deface or destroy "any object or thing of archeological or historical interest or value, whether situated on private lands or within any public park or place." The term "willfully" in a penal statute requires "a purpose or willingness to commit the act" and implies no evil intent. Cal.Penal Code § 7; *see also People v. Atkins*, 25 Cal.4th 76, 104 Cal. Rptr.2d 738, 18 P.3d 660 (2001).

■■■ The Court finds the undisputed facts demonstrate Defendant willfully destroyed items of archeological interest when its employees drove over sites and proximately caused damage to the sites. Moreover, Defendant's actions in destroying the sites are of the nature which the statute was designed to prevent and the Indian tribe is of the class of persons for whose protection the statute was adopted. As such, the motion is GRANTED as to the negligence per se claim based upon section 622 ½.

## XI. Trespass

Quechan moves for judgment on the trespass claims. "Trespass is an unlawful interference with possession of property." *Staples v. Hoefke*, 189 Cal.App.3d 1397, 1406, 235 Cal.Rptr. 165 (citing *Girard v. Ball*, 125 Cal.App.3d 772, 788, 178 Cal. Rptr. 406 (1981)). The Court has dismissed the trespass claims as to lands within the right-of-way. Accordingly, only the trespass claims as to the land outside the right-of-ways remain. Relying on its argument that the government owns the land within the right-of-way in fee, Defendant sets forth no argument opposing the Tribe's assertion they are entitled to trespass for lands located outside Western's right-of-way.

 "Liability for trespass may be imposed for conduct which is intentional, reckless, negligent or the result of an extra-hazardous activity." *Id.* The undisputed evidence demonstrates Western negligently impacted sites outside the right-of-way. Accordingly, Plaintiff is entitled to judgment on the claim for trespass for lands outside the right-of-way.

## XII. Private and Public Nuisance

 Private nuisance is the interference with or invasion of another's use and enjoyment of his or her life or property. Cal.Civ.Code § 3479. The interference must be both substantial and unreasonable. *Fashion 21 v. Coalition for Humane Immigrant Rights of Los Angeles*, 117 Cal.App.4th 1138, 1154, 12 Cal. Rptr.3d 493 (2004). To demonstrate the interference was substantial, the plaintiff must provide evidence he or she suffered "substantial actual damage." *San Diego Gas & Electric Co. v. Superior Court,* 13 Cal.4th 893, 938, 55 Cal.Rptr.2d 724, 920 P.2d 669 (1996). The invasion is unreasonable if "the gravity of the harm outweighs the social utility of the defendant's conduct." *Id.* Reasonableness is a question of fact. *Id.*

 "A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons." Cal.Civ. Code § 3480. To qualify as a public nuisance, the nuisance must be substantial and unreasonable. *In re Englebrecht,* 67 Cal.App.4th 486, 492, 79 Cal.Rptr.2d 89 (1998). "It is substantial if it causes significant harm and unreasonable if its social utility is outweighed by the gravity of the harm inflicted." *County of Santa Clara v. Atlantic Richfield Co.,* 137 Cal.App.4th 292, 305, 40 Cal.Rptr.3d 313 (2006).

The Tribe argues Western unreasonably interfered with its use and enjoyment of the Reservation by permanently scarring cultural resources and land. The government argues Plaintiff fails to demonstrate Western's acts interfered with anyone's use and enjoyment, because there is no evidence that any tribal member was actually deprived of the use and enjoyment of the cultural resource sites. In response, Plaintiff submits evidence that visitation of the sites is not a precondition to the importance of the sites. The government contends this evidence demonstrates a genuine issue of material fact.

 The evidence submitted demonstrates Western's acts caused "substantial actual damage" to the Tribe's cultural resources. However, the reasonableness of Western's acts must be judged by the trier of fact and cannot be resolved on summary judgment. Accordingly, the motion is DENIED as to the nuisance claims.

## CONCLUSION AND ORDER

Based on the foregoing, **IT IS HEREBY ORDERED:**

1. Plaintiff's motion to strike (Doc. No. 124) portions of Defendant's motions

for summary judgment is DENIED AS MOOT.

2. Plaintiff's motion to strike (Doc. No. 126) the deposition transcript of Jamie Cleland is DENIED AS MOOT.

3. Defendant's motion to strike (Doc. No. 134) is DENIED AS MOOT.

4. Plaintiff's motion to strike declaration of Mary Barger (Doc. No. 165) is DENIED AS MOOT.

6. Plaintiff's motion for partial summary judgment on beneficial title and non-property interests (Doc. No. 105) is GRANTED IN PART AND DENIED IN PART. The motion is GRANTED as to interests in cultural resources within the right-of-way lands and DENIED as to beneficial title or ownership interest in the right-of-way lands.

7. Defendant's motion for partial summary judgment regarding land ownership (Doc. No. 109) is GRANTED IN PART AND DENIED IN PART. The motion is GRANTED as to the request for declaration that the United States holds title to the Parker -Davis 161–kv transmission line and lands occupied by all works and appurtenances in fee simple and as to the trespass claim to the extent it seeks relief for damage to property within the right-of-way lands. The motion is DENIED as to the request to dismiss the nuisance claims and negligence claims.

8. Plaintiff's motion for partial summary judgment as to the claims for negligence, gross negligence, negligence per se, trespass, private nuisance and public nuisance (Doc. No. 103) is GRANTED IN PART AND DENIED IN PART. The motion is GRANTED as to (1) the negligence claims as to sites 7140, 7147, 7138 and 689; (2) the negligence per se claim as to sites 7140, 7147, 7138 and 689; (3) the motion for an order finding Defendant had a duty to not destroy cultural resources ineligible for listing on the National Register; and (4) the trespass claim for damage to lands outside the right-of-way lands for which the defendant admits damage. The motion is DENIED as to (1) the negligence claims as to sites 7141 and 7143; (2) the claim for gross negligence; (3) the trespass claims for damage to property within the right-of-way lands; (4)the private nuisance claim; and (5) the public nuisance claim.

9. Defendants motion for summary judgment (Doc. No. 114) is GRANTED IN PART AND DENIED IN PART. The motion is GRANTED as to (1) claims based upon Western's decision to undertake the pole replacement project; (2) claims based upon the decision to prepare a "categorical exclusion" rather than an environment analysis or impact statement; (3) claims based upon Western's failure to properly manage or supervise their employees; (4) the request to dismiss site 7149; (5) claims for declaratory relief and injunctive relief; and (6) citations in the complaint to Quechan law in support of the FTCA claim. The motion is DENIED as to (1) the request to dismiss the complaint as barred by the statute of limitations; (2) request to dismiss the action to the extent it improperly relies on state law claims with no private right of action; (3) request to dismiss allegations of breach of a fiduciary duty; (4) claims based upon the decision to use tracked vehicles; (5) claims based upon the alleged failure to disclose relevant information prior to commencement of the pole-replacement project; (6) claims

based upon the alleged failure to disclose harm to the Tribe; (7) request to dismiss sites 7144, 7148, 7151, 7152, and 7153; and (8) claims brought pursuant to *parens patriae* capacity. Defendant's motion to substitute the parties is DENIED AS MOOT.